| | | |
|---|---|---|
| **THE HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY and HARTFORD CASUALTY INSURANCE COMPANY,** | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **2:08cv1564** |
| | ) | **Electronic Filing** |
| | ) | |
| **INTERNATIONAL GLASS PRODUCTS, LLC,** and **FRANCISCO A. FERNANDEZ,** | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

This is a civil declaratory judgment and damages action filed by plaintiffs, The Hartford

Steam Boiler Inspection and Insurance Company ("HSB") and Hartford Casualty Insurance

Company ("Hartford"), against defendants, International Glass Products, LLC ("IGP") and

Francisco A. Fernandez ("Fernandez"). The dispute concerns the parties' respective rights and

obligations under a business insurance policy issued by Hartford in favor of IGP.  On August 30,

2007 and October 27, 2007, IGP sustained damage to certain business property for which it

sought to obtain insurance proceeds under the policy at issue.  During the course of the claim

adjustment process, plaintiffs concluded that IGP and Fernandez had engaged in fraudulent

conduct relative to IGP's claim.  Consequently, on July 21, 2008, HSB sent IGP a denial letter

indicating its intent to void the subject policy and reserving its right to recover payments

previously made.  Thereafter, plaintiffs commenced this lawsuit.

Presently pending before the court are the parties' cross-motions for summary judgment pertaining to plaintiffs' claims against IGP and IGP's counter-claims against plaintiffs. For the reasons that follow, IGP's motion for partial summary judgment as against HSB (ECF No. 211) will be granted. IGP's motion for partial summary judgment as against Hartford (ECF No. 213) will be denied. Plaintiffs' motion for summary judgment against IGP (ECF No. 207) will be granted in part and denied in part.

## I. Background[1]

IGP's Business

At times relevant to this lawsuit, IGP was in the business of manufacturing specialty tempered glass panels for use in ovens, ranges, cook tops, and other large kitchen appliances. (DSMF ¶1.)[2] It had two main production lines for its products: "Line 1," which manufactured smaller specialty tempered glass panels, and "Line 2," which manufactured larger tempered glass panels. (Id. at ¶3.) As of August 1, 2007, IGP operated out of a facility located in Ambridge, Pennsylvania. (Id. at ¶2.)

The Hartford Policy

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Because the record is voluminous and the parties are well aware of the underlying facts, the court will recite only those facts that are material to its disposition.

[2] Citations to "DSMF ¶ ___" refer to IGP's Concise Statement of Material Facts in Support of Defendant, International Glass Products, LLC's Motion for Summary Judgment (ECF No. 215) and plaintiffs' response thereto (ECF No. 219).

Effective August 1, 2007, IGP held an insurance policy with Hartford (hereafter, the "Policy"), which provided first party property loss coverage for IGP's business personal property, including equipment breakdown coverage, as well as business income loss and extra expense coverage. (DSMF ¶¶ 4, 5.)[3] The liability limit for business personal property was $2.6 million for any single occurrence; the limit for business income and extra expense losses was $4 million for any single occurrence. (Id. at ¶8.) The Policy expressly identified Hartford as the "Company" providing the insurance coverage to IGP. (Id. at ¶¶ 6-7.)

At issue in this case are various provisions in the Policy that bear on the parties' competing claims. In relevant part, the Policy allowed IGP to collect replacement costs following an equipment breakdown accident if replacement was required. In that event, the insurer would indemnify IGP for the amount actually spent "that is necessary to repair or replace the ... physically damaged property." (Pl.s' Ex. 1 at pp. 20-21, ECF No. 210-1.) The "Loss Payment" provision of the Policy stated that, "In the event of physical loss or physical damage covered by this policy... We will determine the value of Covered Property." (DSMF ¶39.) An endorsement entitled "PENNSYLVANIA CHANGES" added the following superseding language to the Loss Payment provision:

**NOTICE OF ACCEPTANCE OR DENIAL OF CLAIM**

1. Except as provided in 3. below, we will give you notice, within 15 working days after we receive a properly executed proof of loss, that we:

    a. Accept your claim

    b. Deny your claim; or

    c. Need more time to determine whether your claim should be accepted or denied.

---

[3] The subject policy was formally entitled "Hartford Spectrum Business Insurance Policy" and had an assigned policy number "SBAPI1518DW." (DSMF ¶4.)

> If we deny your claim, such notice will be in writing, and will state any policy provision, condition or exclusion used as a basis for the denial.
>
> If we need more time to determine whether your claim should be accepted or denied, the written notice will state the reason why more time is required.

2. If we have not completed our investigation, we will notify you again in writing, within 30 days after the date of the initial notice as provided in 1.c. above, and thereafter every 45 days. The written notice will state why more time is needed to investigate your claim and when you may expect us to reach a decision on your claim.

3. The notice procedures in 1. and 2. above do not apply if we have a reasonable basis, supported by specific information, to suspect that an insured has fraudulently caused or contributed to the loss by arson or other illegal activity. Under such circumstances, we will notify you of the disposition of your claim within a period of time reasonable to allow full investigation of the claim, after we receive a properly executed proof of loss.

(DSMF ¶38.) An additional, relevant, endorsement entitled "LOSS PAYABLE PROVISIONS" provided, in part:

**A. LOSS PAYABLE**

> For Covered Property in which both you and a Loss Payee shown in the Declarations have an insurable interest[4], we will:
>
> 1. Adjust losses with you; and
>
> 2. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

(DSMF ¶40.) The parties agree that, in each of these provisions, the terms "you" and "your" referred to IGP and the terms "we" and "our" referred to Hartford. (Id. at ¶¶ 6, 41.)

Also at issue in this case is a provision set forth in the "Common Policy Conditions" -- specifically, Common Policy Condition (C), which provided:

**C. Concealment, Misrepresentation or Fraud**

> This Policy is void in any case of fraud by you as it relates to this Policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning: ...

---

[4] National City Bank, as IGP's lender, was an additional insured and "Loss Payee" under the Policy. (DSMF ¶40.)

4. a claim under this policy.

(Pl.s' Ex. 1, ECF No. 210-1 at p. 39 of 180.)

Hartford's Reinsurance Treaty with HSB

Prior to August 1, 2007, Hartford had entered into a separate "treaty agreement" with HSB (hereafter, the "Reinsurance Treaty" or "Treaty"), which remained in effect at all times relevant to this lawsuit. Pursuant to this Treaty, HSB reinsured the "equipment breakdown" liability of Hartford on certain covered businesses, including IGP. (DSMF ¶56.) As it pertains to this case, the Treaty provided that HSB would reimburse Hartford one-hundred percent (100%) for any payments that HSB authorized on equipment breakdown claims. (DSMF ¶64; Pl.s' Ex. 2, Reinsurance Treaty, Art. 1, ECF No. 210-3.) HSB was, in turn, reinsured under a treaty with two other reinsurers, AIG and Hanover Re. (DSMF ¶¶87, 89.) HSB's reinsurance took effect on losses that reach and/or exceed $1 million, such that AIG and Hanover Re would reimburse HSB dollar-for-dollar for loss payments made by HSB over $1million per loss, including in this case. (Id. at ¶¶ 87-89.)

Hartford's Reinsurance Treaty with HSB provided that HSB, at its expense, would "investigate, negotiate and enter into settlement agreements or defend all such claims and losses in accordance with the terms of the coverage subject to this [Treaty]," but Hartford could "participate in any such investigation, negotiation, settlement or defense" at its own expense. (Pl.s' Ex. 2, Reinsurance Treaty, Art. 9(B), ECF No. 210-3.) The Treaty further provided that, in the event that HSB settled a claim or loss arising under coverages that were subject to the Treaty,

Hartford would make payment directly to the Insured, under the coverages subject to [the Reinsurance Treaty]." (Id. at Art. 9(C).)

To "facilitate the handling of claims" subject to the Reinsurance Treaty, Hartford and HSB collectively developed "Special Handling Instructions" and claim service guidelines. (Def.'s Ex. 121, ECF No. 229-121.) These guidelines emphasize that the relationship between Hartford and HSB is "one of carrier and reinsurer, with the ultimate responsibility to the customer being retained by the Hartford." (Id.) However, "[t]he expertise of HSB in equipment breakdown losses, ... by agreement, dictates [HSB's] role in the adjustment process." (Id.) The guidelines contemplated that HSB would notify Hartford's claim handler, on a monthly basis, of the amounts to be paid to Hartford's insured under the Hartford policy; however, "[u]nder no circumstances" were HSB adjusters to "engage in discussion of or make statements to the customer or agent as to the applicability of coverage under the policy or the reinsurance agreement." (Id.) Instead, "[a]ll coverage inquiries or issues [were to] be referred to The Hartford's claim handler to address with the insured." (Id.)

The August 30 and October 27, 2007 Incidents

On August 30, 2007, IGP's business sustained a physical loss and damage to its production lines and equipment after a high voltage burst of electricity surged through the circuitry of the plant, including the data highway that connected and controlled the furnaces for Lines 1 and 2. (DSMF ¶13.)

Hartford received notice of the incident the following day. (DSMF ¶12.) On September 11, 2007, Alan Mycek, a national general adjuster for Hartford, advised IGP through IGP's insurance agent, the Gleason Group, Inc., that IGP's claim had been reassigned to the Hartford Property Large Loss unit due to the size and nature of the loss. (Id. at ¶¶10, 14.) Mycek further

advised that one of Hartford's "most experienced Property Claim professionals," Chris Correll, would be working with IGP during the claim resolution process. (Id. at ¶14.)

Pursuant to the Reinsurance Treaty, Hartford gave HSB notice of the August 30, 2007 loss. (DSMF ¶74.) Thereafter, Hartford and HSB undertook dual investigations to determine, as between them, which entity would be responsible for IGP's loss and which entity would investigate the loss, adjust the claim, and ultimately determine the amount of IGP's loss under the Policy. (Id. at ¶75.) On or about October 8, 2007, HSB and Hartford determined that IGP's loss fell within the "equipment breakdown" coverage of the Policy and thus fell under the terms of the Reinsurance Treaty. (Id. at ¶80.)

Meanwhile, following the August 30 incident, IGP's maintenance department undertook repairs to the damaged equipment. The repairs involved the replacement of approximately fifteen ceramic rollers that had been broken or damaged. These were replaced with other rollers from IGP's inventory. (Pl.s' Ex. 3, Bennett Dep. at 48:16-49:10, ECF No. 210-4.) After completing the repairs, IGP resumed production on Line 2.

On October 27, 2007, the partially repaired Line 2 suffered a more catastrophic failure which resulted in additional damage to the rollers and other components and caused a complete shutdown of IGP's operations on Line 2. (DSMF ¶¶ 16, 90.) This incident led IGP to submit additional claims to Hartford for property damage and business interruption losses.

The Alleged Fraud

The plaintiffs' claims in this case center around various representations that were made and/or conduct that was undertaken during the claims adjustment process by Joe Nocito (IGP's president), defendant Fernandez, and various individuals employed by IGP. For present purposes, the alleged fraud concerns two issues: (i) IGP's alleged need for additional

replacement rollers and the purchasing and shipment thereof; and (ii) the employment status of IGP's maintenance supervisor, Paul Ciarrochi, Jr. Plaintiffs contend that IGP engaged in fraudulent conduct relative to these two matters, thereby justifying the cancellation of IGP's insurance coverage pursuant to Common Policy Condition (C). Plaintiffs allege the following concerning IGP's conduct.

A. Representations Regarding Replacement Rollers

Following the events of August 30, 2007, IGP took the position that it was necessary to replace the damaged ceramic rollers rather than simply refurbish them. (Pl.s' Ex. 15, ECF No. 210-15.) IGP further represented that it had contacted domestic manufacturers with the capability of replacing the ceramic rollers and that the only two domestic manufacturers, Vesuvius USA, and Ceradyne, Inc., could not manufacture replacement rollers for at least eight months. (Pl.s' Ex. 17, ECF No. 210-15, and Ex. 28 at ¶5, ECF No. 210-18.)

Rather than ordering the replacement rollers domestically, IGP sought Hartford's approval for ordering the new rollers from a Chilean company known as Global Networking ("Global") which, according to IGP, could provide delivery by late November 2007. (Pl.s' Ex. 17, ECF No. 210-15.) On the basis of these representations, plaintiffs authorized the purchase of 178 replacement rollers from Global. In support of its request to be reimbursed for the cost of purchasing replacement rollers from Global, Nocito submitted the following documents to plaintiffs: (i) Invoice #26753 dated September 18, 2007 from Global to IGP in the amount of $144,180 (Pl.s' Ex. 18, ECF No. 210-15); and (ii) Purchase Order No. 9248 from IGP to Global (Pl.s' Ex. 19, ECF No. 210-15). In late September 2007, HSB authorized Hartford to issue payment to IGP for parts already ordered, including the 178 replacement rollers from Global.

(Pl.s' Ex. 22, ECF No. 210-18.)  IGP then purportedly issued two checks to Global, totaling $144,180.00, ostensibly in payment of the replacement rollers.  (Pl.s' Ex. 27, ECF No. 210-18.)

Thereafter, IGP informed plaintiffs that Global was having difficulty meeting its estimated shipping date of November 19, 2007.  (Pl.s' Ex. 28 at ¶7, ECF No. 210-18.)  These delays necessarily extended the restoration period and necessitated the further continuation of business interruption payments.

At some point, plaintiffs became suspicious of IGP's representations concerning the delayed shipment of the rollers.  They requested documentation confirming IGP's representation that there had, in fact, been a long manufacturing lead time estimated by domestic suppliers. In response to this request, IGP provided a document dated March 14, 2008 from a Vesuvius representative named Doug Brown stating, "Due to delays in commissioning a grinding machine, lead times can be extended up to 8 months for certain part types."  (See Pl.s' Ex. 17, ECF No. 210-15.)

To further address the plaintiffs' concerns, Fernandez created a written document entitled "Roller Timeline," (Pl.s' Ex. 28, ECF No. 210-18), which detailed the alleged purchase and shipment of the replacement rollers from Global.  Fernandez submitted this document to Penny Wolfe, an employee of the Gleason Group, Inc., and Wolfe then forwarded the timeline to plaintiffs on April 21, 2008.  Included in the Roller Timeline were the following representations:

(1) the replacement rollers from Global were shipped to Charleston, South Carolina from Chile, by boat, on January 25, 2008 (Ex. 28 at ¶9);

(2) the replacement rollers arrived in the Port of Charleston, South Carolina on March 14, 2008 and were available for removal from customs on March 21, 2008 (id. at ¶ 10);

(3) the replacement rollers could not be released from customs until original shipping documents were produced (id. at ¶11);

(4) IGP submitted the required shipping documents so that the replacement rollers could be released from customs on April 4, 2008 (id. at ¶12); and

(5) the replacement rollers were transported via truck, by a shipping company named Estes, from the Port of Charleston to IGP's new manufacturing location in Robinson township, Pennsylvania on April 11, 2008 (id. at ¶14).

On April 22, 2008, Fernandez submitted several additional "third party" documents to Wolfe, who then forwarded them on to plaintiffs. (Pl.s' Exs. 30 and 34, ECF No. 210-19.) The first document was a Spanish language bill of lading allegedly signed on January 22, 2008 and purportedly evidencing the shipment of 178 replacement rollers from Global in Santiago, Chile to the Port of Charleston, South Carolina. (Pl.s' Ex. 31, ECF No. 210-19.) The second document was a Spanish receipt from Global in Santiago, Chile dated January 25, 2008, representing that the ceramic rollers departed Santiago on that date for ultimate delivery to IGP's new facility in Robinson Township. (Pl.s' Ex. 32, ECF No. 210-19.) The third document was a bill of lading purportedly evidencing the shipment of the new rollers from the Port of Charleston to IGP's new Robinson Township facility. (Pl.s' Ex. 33, ECF No. 210-19.) Nocito was copied on the email from Fernandez to Wolfe, which attached these documents. (Pl.s' Ex. 34, ECF No. 210-19.)

On May 1, 2008 HSB's engineering consultant, Ron Chauffe ("Chauffe"), visited IGP's Robinson Township facility for the purpose of inspecting the replacement rollers allegedly supplied by Global. Upon inspecting the crates, Chauffe found new rollers on the top layer of each crate and refurbished rollers throughout the rest of the crate. (Pl.s' Ex. 8, Ciarrochi Dep. at 70:23-71:10, ECF No. 210-11.) One of the crates contained a roller bearing a Vesuvius label. (Pl.s' Ex. 39, Chauffe Dep. at 64:14-65:16, ECF No. 210-22; Pl.s' Ex. 70, ECF No. 210-35.) Thereafter, plaintiffs requested that they be able to view the damaged rollers that had been removed from the furnace in Line 2, but they were informed that all of the damaged rollers had

been discarded. Nocito reiterated this position to Wolfe in a May 6, 2008 email, stating that, "[t]he rollers were crushed and put into our dumpsters" and another company had been paid "to remove the garbage." (Pl.s' Ex. 41, ECF No. 210-23.)

Plaintiffs contend that, during the claims investigation process, they discovered discrepancies in the information provided by IGP, as well as blatantly false representations. In particular, they claim that IGP never received replacement rollers from Global, but instead sent approximately 173 rollers to Vesuvius, USA, in Dillon, South Carolina, on February 19, 2008 to be refurbished. The refurbished rollers were delivered back to IGP on March 29, 2008, just thirty-five (35) days later. According to plaintiffs, the cost of refurbishment was just $39,000, or approximately $105,000 less than the insurance coverage that was paid out.

In addition, the "third party" shipping documents that were submitted to plaintiffs by IGP were fabrications created for the purpose of supporting IGP's prior representation that the rollers were being replaced and that delays in shipment had occurred. The Roller Timeline prepared by Fernandez contained false information as well.

Plaintiffs also discovered, upon further investigation, that Fernandez had personally negotiated the checks paid to Global and deposited them into his personal bank account. Plaintiffs contend that, by the time they discovered the foregoing misrepresentations, Hartford had issued payments on IGP's claim totaling $2,407,412.18. They theorize that IGP made intentional misrepresentations about the rollers in order to create the false impression that the damaged rollers were being replaced and that there were delays in shipment; in this way, plaintiffs claim, IGP could explain the period of delayed restoration and continue to receive continued business interruption payments under the Policy.

Plaintiffs requested that IGP provide it with an examination under oath pursuant to the requirements of the Policy. Nocito provided the requested examination on behalf of IGP on June 30, 2008. In doing so, Nocito affirmed that Global was the manufacturer of the rollers that had been purchased from Chile and shipped from Chile to IGP. (See generally Pl.s' Ex. 7, ECF Nos. 210-9 and 210-10.)

B. Representations Concerning the Employment Status of Paul Ciarrochi, Jr.

Plaintiffs contend that, in an effort to explain some of the delays experienced in connection with the furnace repair process, and in support of its request for salary payments, IGP made several representations to Hartford and/or HSB regarding the employment status of its maintenance supervisor, Paul Ciarrochi, Jr. ("Ciarrochi").

By email dated January 25, 2008, Nocito represented to HSB that Ciarrochi had received offers to work for a competitor. (Pls.' Ex. 42, ECF No. 210-23.) Several days later, on January 29, 2008, Nocito wrote to Hartford adjuster Chris Correll, stating that "Frank and Paul are the best candidates for getting this furnace up and running in a timely manner," and "Paul [has] opportunities with the competition." (Pl.s' Ex. 43, ECF No. 210-23.) Later, in March 2008, Nocito sent correspondence to representatives of Hartford and HSB, stating:

> I have hired Paul back to work for IGP. As everyone is well aware, he is an extremely valuable asset to IGP. He has requested that I pay him both W2 & 1099 based on advice from his accountants. It actually works to IGP's advantage paying the majority of his pay as 1099. If this presents a problem please let me know immediately. I hope HSB is as happy as I am that Paul has left the competition and decided to come back full-time to IGP. His departure would have been a tremendous loss to IGP and the repair process. ...

(Pl.s' Ex. 45, ECF No. 210-23.)

Similar representations were made by Wolfe in a March 25, 2008 email to Mycek. In response to concerns about the ordering of heating elements for IGP's furnace, Wolfe wrote that "Mr. Nocito needed to order the elements but did not have either Frank or Paul on staff at the time to arrange the order for the correct elements. He hired Paul back ... and Paul determined what elements should be ordered by specification." (Pl.s' Ex. 46, ECF No. 210-23.) In addressing the plaintiffs' concerns over the ordering of ceramic insulators, Wolfe wrote that "[t]hese parts were newly discovered to be needed. Joe Nocito (is not an engineer) and did not have Frank Fernandez or Paul on staff to tell him that the old ceramic insulators would break when the old elements were to be removed." (Id.) Wolfe further represented that Ciarrochi earned more than $19,000 per month. (Id.) In support of IGP's request for insurance payments to cover the temporary payroll expense of Ciarrochi's salary, Wolfe wrote the following:

> [Ciarrochi] is now making more than $19K a month from his original salary with International Glass. It was discussed that the competition was willing to pay more for Paul's salary. ... International Glass asked if Paul's salary can be paid by HSB. Again we mentioned that this is probably only a 3 month period. Either way we should like a definitive answer. HSB has requested an explanation of Paul's status for further consideration, however, we are not certain what documentation satisfies that explanation.

(Id.)

Ciarrochi has testified in this case that he was employed by IGP at all relevant times and was never, at any point, approached by a competitor about leaving IGP. (Pl.s' Ex 8, Ciarrochi Dep. at 112:4-6, 117:9-15, 118:2-6, 121:22-122:1, 124:18-23, 125:2-8.) Ciarrochi further testified that he was not a 1099 employee and was actually earning less than $4,000 per month during the relevant time period. (Id. at 117:19-118:6, 121:19-21.) Plaintiffs theorize that IGP made false representations concerning the employment status of Ciarrochi in order to justify and

explain the delayed restoration period and thereby extend the period during which it could obtain business interruption payments.

C. IGP's Counter-Version of the Events Relating to the Alleged Fraud

IGP disputes many of plaintiffs' factual averments and assumptions and vociferously denies that any insurance fraud occurred. Fundamentally, IGP insists that, at all relevant times, Fernandez was acting as an agent of Global Networking and/or "FERPASO," an entity with whom IGP contracted to complete repairs to its furnace. With regard to the original rollers that had been damaged in the arcing incident, IGP maintains that these rollers were, in fact, discarded, consistent with the view of one of HSB's own experts that the rollers had been too badly damaged to be refurbished. According to IGP, Fernandez, in his capacity as an independent third-party agent, placed the order for new rollers with Global Networking, but later discovered during one of his visits to the company that Global Networking was having difficulty making rollers that would fit IGP's equipment. IGP claims that, upon discovering this problem, Fernandez unilaterally decided to send rollers that he personally owned to Vesuvius for refurbishing so that IGP could use those rollers and get its production back on line as quickly as possible, thereby minimizing its business interruption losses while Global Networking continued to work on the production of new rollers that would suit IGP's needs. According to IGP, Fernandez did this because he felt an obligation, as an associate of Global Networking, to fulfill the company's contract with IGP, at least temporarily until new rollers arrived; in addition, as FERPASO's agent, Fernandez felt an obligation to have the furnace operating quickly. IGP insists that Fernandez, acting on behalf of FERPASO and Global Networking, deliberately kept this arrangement from Nocito – and, to that end, secured the fraudulent shipping documents, because Fernandez was associated with Global Networking and wanted to avoid the

14

embarrassment of revealing the company's difficulties fulfilling IGP's order. (See ECF No. 226 at pp. 25-42; see also DSMF ¶¶ 123-124, 203-208, 211-14, DCMF at ¶¶ 10-17, 25, 33-34, 37-53, 94, ECF No. 227.)[5]

With regard to Mr. Ciarrochi, IGP denies that it ever made any knowingly false or misleading statements concerning his employment status. IGP maintains that its "request" for a higher salary concerned only a short period of time (i.e., several months) during which Ciarrochi would assist in the repair of its furnace. IGP points out that its "request" was never honored by HSB, and no such payments were ever approved. IGP further claims that Nocito believed Ciarrochi was requiring the higher salary based upon a compensation figure that Chauffe (HSB's agent) had offered to Ciarrochi in connection with Chauffe's own bid to repair the furnaces. (See Doc. 226 at pp. 22-25, DCMF ¶¶ 64-77.)

The Claim Denial

On July 21, 2008, Ricky Burke, HSB's Executive General Adjuster, sent a letter to the Gleason Group which advised, in relevant part, that:

> Based on its investigation to date, HSB has concluded that the Insured violated [Common Policy Condition II(c)] through its submission of invoices, foreign and domestic shipping documents and purchase orders relating to the Insured's alleged purchase of new ceramic rollers, upper and lower blocks and scallops for furnace/Production Line #2 from Global Networking. HSB also believes that the Insured violated this condition in the Policy by concealing the fact that some or all of the damaged rollers from Furnace/Production Line #2 were actually refurbished by a domestic supplier and installed again in the furnace rather than being discarded as claimed by the Insured. These actions resulted in HSB making payments to the Insured for parts (including rollers, upper and lower blocks and scallops) which were never ordered nor delivered to International Glass Products, LLP ("IGP"). Additionally, the misrepresentations and concealment regarding the refurbishment of the rollers resulted in HSB continuing to make Business Interruption payments beyond what was reasonably necessary to repair the

---

[5] Citations to "DCMF ¶ ___" refer to IGP's Counterstatement to plaintiffs' Concise Statement of Material Facts, ECF No. 227.)

damaged furnace.  Pursuant to Common Policy Condition II(c), HSB, therefore, declares the Policy void and will not make any further payments on this claim.  Additionally, HSB reserves its right to recover back from the Insured those payments made to IGP to date on this claim.

(Pl.s' Ex. 55, ECF No. 210-25.)

Three days later, on July 24, 2008, Nocito executed an affidavit in which he represented that, earlier that same day, he had been advised by Fernandez for the first time that the rollers did not originate from Chile.  The affidavit stated as follows:

I provided a copy of a letter that was written on July 21, 2008 from Ricky Burke, Executive General Adjuster from HSB to Mr. Frank Fernandez on Wednesday, July 23 after EMC, a representative of Hartford Steam Boiler, and Paul Bartko[,] a Special Investigator for The Hartford[,] examined and photographed the IGP facility at 4100 Steubenville Pike on the morning of July 23.  This morning at approximately 10:55 a.m., Mr. Fernandez came into my office at 4100 Steubenville Pike and asked to speak with me in confidence and asked to have the door closed.  Mr. Fernandez said "I have read letter from Ricky Burke dated July 21, 2008 and I have something to tell you about the rollers."  I stopped him at that point and I asked him, "Frank, did the rollers come from Chile?"  Frank answered, "Joe, I'm sorry to tell you this information at this late date but based upon the letter I thought it was necessary.  The rollers did not come from Chile." I became very frustrated and angry and used several expletives and proceeded to ask Mr. Fernandez where did the rollers come from if they did not come from Chile.  Mr. Fernandez told me not to worry about where the rollers came from.  I stopped him and said "I want to know [expletives] where the rollers came from." He said "Joe, I provided you with good rollers as promised by Global Networking."  I asked where.  He said "Joe, it's none of your business where I got the rollers.  Global Networking was paid to get rollers and Global Networking did provide rollers."  I told him that I had testified under oath that the rollers came from Chile based upon information that he had provided to my assistant Jessica Emark and this is now inconsistent with my examination under oath. [Fernandez said,] "Joe, you have nothing to worry about.  The rollers in the furnace are good and as soon as we get electricity, I will be able to begin testing the furnace." I told him that IGP had paid his company Global Networking for new rollers that were to come from Chile and now "you are telling me that they did not come from Chile."  He interrupted and said "Joe whenever I went to Chile in November to inspect the rollers, I realized that those rollers in Chile would not work in the furnace and I had to move onto Plan B."  I asked "What was Plan B?"  Frank said Global Networking realized that it was contractually obligated to provide rollers to IGP and he did indeed deliver upon his obligation.  "The rollers are installed and the furnace is ready to go.  Joe you have nothing to worry about."

I packed my stuff up and I said I have an appointment with my attorney. This was the first I had heard any of this information. ...

(Pl.s' Ex. 56, ECF No. 210-25.)

IGP's Complaints Relative to HSB's Handling of Its Claim

IGP raises numerous objections concerning the manner in which its claim was handled. Fundamentally, it contends that Hartford breached the terms of the Policy by, in effect, abandoning its role as insurer and substituting HSB in its place. In particular, IGP objects that Hartford delegated to HSB numerous discretionary matters that, according to IGP, were critical to the claims adjustment process. IGP insists that HSB's decisions on these critical matters were made recklessly and/or in bad faith, with HSB's own financial interests consistently being placed ahead of the fiduciary duties that were owed to IGP. Among other things, IGP alleges that HSB:

- wrongly treated the August 30 and October 27, 2007 incidents as one loss subject to only one set of policy limits;

- improperly replaced Hartford's professional engineers with Ron Chauffe of Electri-Mech Corporation ("EMC"), an individual whom IGP characterizes as incompetent and unqualified to handle the investigation of its loss;

- fraudulently held out Chauffe as an "engineer" or "engineering consultant," when Chauffe lacked a college degree or any training as an engineer;

- improperly withheld from IGP a report authored by Glenn Robinson and Thomas Traubert, two professional engineers that HSB had retained in mid-December 2007 to help investigate the claim; in particular, IGP insists that HSB wrongly withheld the recommendation by Traubert and Robinson that IGP retain the specialized services of a "process control vendor" to guide the repair process;

- summarily rejected any consideration of totally replacing the damaged furnace rather than attempting to repair it;

- improperly refused to help IGP obtain quantities of raw material glass that would be necessary to test the furnace after repairs were completed;

- significantly undervalued IGP's business interruption losses, thereby severely restricting IGP's cash flow and operations during the time its claim was being adjusted and its furnace was being repaired;

- arbitrarily and improperly suspended IGP's business interruption loss payments when IGP moved its business to a new facility located in Robinson Township, Pennsylvania;

- conducted a shoddy investigation and arrived at an unfounded theory that IGP had engaged in fraudulent conduct; and

- improperly voided the Policy, to which it was not a party.


This Litigation

Plaintiffs initiated this litigation on November 10, 2008 with the filing of their complaint against IGP and Fernandez. On November 20, 2008, IGP sued Hartford and HSB in the Allegheny County Court of Common Pleas for alleged breach of contract and bad faith. IGP's state court action was subsequently removed to the Western District of Pennsylvania, and the two actions were consolidated.

As the result of protracted pretrial proceedings, plaintiffs' Third Amended Complaint ("TAC") is now the operative pleading for the plaintiffs. It asserts three claims against IGP: a claim seeking to void the Policy and recover payments based on IGP's alleged violation of "Common Policy Condition (C)" (Count I); an alleged violation of Pennsylvania's Insurance Fraud Statute, 18 Pa. C.S.A. § 4117 (Count III);[6] and a claim for "reverse bad faith" under the Policy (unnumbered Count IV). (ECF No. 142.) IGP has asserted numerous counterclaims against plaintiffs, including claims for breach of contract against Hartford (Counterclaims I and II); a claim against HSB for alleged interference with its contractual relationship with Hartford (Counterclaim III); and claims against both plaintiffs for statutory bad faith (Counterclaim IV),

_____

[6] Plaintiffs also assert a claim for fraud against Fernandez personally at Count II of the TAC. That claim is not the subject of the pending motions for summary judgment and will not be addressed further herein.

common law bad faith (Counterclaim V), common law fraud (Counterclaim VI), and negligence (Counterclaim VII). (ECF No. 158.) In their answer to these counterclaims, plaintiffs asserted, among other things, the affirmative defense of fraudulent misrepresentation on the theory that IGP's alleged violation of Common Policy Condition (C), relating to "Concealment, Misrepresentation or Fraud," is a complete bar to any recovery in this matter. (ECF No. 159.)

The parties filed their cross-motion for summary judgment and supporting materials on June 8, 2015 (ECF No. 207, 208, 209, 210, 211, 212, 213, 214, 215, and 216). In their joint rule 56 motion (ECF No. 207), plaintiffs seek summary judgment on all claims and counterclaims in this litigation on the grounds that "IGP, its employees, agents and/or apparent agents, made indisputably fraudulent misrepresentations and engaged in fraudulent conduct in connection with the insurance claim at issue, thereby voiding all coverage under the insurance policy." (Pls.' Mem. Law Supp. Mot. Summ. Judg. at 1, ECF No. 208.) In its cross-motion for summary judgment against HSB (ECF No. 211), IGP seeks judgment in its favor as to all claims raised by HSB. In its cross-motion against Hartford (ECF No. 213), IGP seeks partial summary judgment as to liability only with respect to the breach of contract claim at Counterclaim 1.

The parties filed their respective opposition papers to the pending motions on July 24, 2015. (See ECF Nos. 219, 220, 221, 222, 223, 224, 225, 226, and 230.) Replies and related materials were filed on August 7, 2015. (See ECF Nos. 233, 234, 235, 236, 237, 238 and 239.)

As a result of the foregoing filings, the issues raised in the parties' cross-motions have been adequately joined and are ripe for resolution.

## II. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled

to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Id. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 180 (3d Cir.1999), Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir.1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Rather, the non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir.1998), quoting Fuentes v. Perskie, 32 F.3d 759, 762 n.1 (3d Cir.1994).

These rules apply with equal force to cross-motions for summary judgment. See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir.2008). When confronted with cross-

motions for summary judgment, as in this case, the Court considers each motion separately. See Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co., 10 F.3d 144, 150 (3d Cir.1993) (noting that concessions made for purposes of one party's summary judgment motion do not carry over into the court's separate consideration of opposing party's motion).

### III. Discussion

A. IGP's Motion for Summary Judgment Against HSB [ECF No. 211]

The court will first address IGP's motion for summary judgment (ECF No. 211) relative to the claims that HSB has asserted in Counts I, III, and IV of the TAC.  IGP seeks a declaration that: (1) HSB was not a party to the Policy and therefore has no right to bring an action against IGP under the Policy or to enforce any term thereof; (2) HSB was not IGP's insurer and therefore lacks any right to bring a claim under Pennsylvania's insurance fraud statute, 18 Pa. C.S.A. §4117; and (3) HSB has no legally enforceable claim against IGP for "reverse bad faith," because it lacks any rights under the Policy and because Pennsylvania does not recognize this type of claim.  HSB opposes such a ruling.  The court will address each of these issues in turn.

1. *IGP's Alleged Violation Common Policy Condition (C) Pertaining to "Concealment, Misrepresentation, and Fraud" (TAC Count I)*

Plaintiffs' claim against IGP in TAC Count I is based on the theory that IGP engaged in "intentional concealment, fraud, and/or misrepresentation of facts" within the meaning of Common Policy Condition (C), thereby voiding the Policy.  (TAC ¶¶ 99-100.)  Plaintiffs theorize that, in an attempt to maximize payments under the Policy and inflate their business interruption losses, IGP made materially false representations regarding its procurement of replacement rollers and lied about the departure and rehiring of Ciarrochi at a higher compensation level. (ECF No. 208 at 4-13, 24-36, 43-47.)  As a result of IGP's alleged misconduct, plaintiffs seek to

declare the Policy void *ab initio* and recover from IGP all insurance payments made to date. (TAC at ¶ 100.)

IGP's primary argument in moving for summary judgment against HSB is that HSB, as a party to a reinsurance treaty with Hartford, lacks contractual privity with IGP and has no contractual rights relative to the underlying Policy. HSB, on the other hand, argues that it should have standing to assert the fraudulent misrepresentation claim because IGP's alleged fraud was perpetrated directly upon HSB during its investigation and adjustment of IGP's claims and HSB is the party that suffered the most harm as a result of IGP's fraud.

Pennsylvania has long recognized the general rule that a party who is a stranger to a contract cannot assert rights thereunder.[7] See Herman v. Stern, 213 A.2d 594, 605 (Pa. 1965) ("As a general rule only parties to a contract may enforce it and strangers to a contract acquire no rights thereunder.") (citing Williston on Contracts § 347 (Jaeger ed. 1959) and Corbin on Contracts §124 (1963)); see also Howes v. Scott, 73 A. 186, 187 (Pa. 1909)("At common law no one could maintain an action upon a contract to which he was not a party.  This rule is well established in this country, and is recognized by both the state and federal courts.").

By the same token, a party to a contract does not generally become liable for breach of that contract vis-a-vis others who are not parties to that contract.  See Rottmund v. Cont'l Assur. Co., 761 F. Supp. 1203, 1208 (E.D. Pa. 1990) ("In the absence of some statutory, common law, or equitable duty, the parties to an agreement have no obligation to a nonparty, regardless of the

---

[7] As a federal court sitting in diversity, we are required to apply the substantive law of the state whose law governs the action. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Spence v. ESAB Grp., Inc., 623 F.3d 212, 216 (3d Cir. 2010). Here, the parties agree that Pennsylvania law governs their dispute.

extent to which that nonparty is interested in enforcement or abrogation of the contract.").[8]

"'When there has been no direct transaction between the plaintiff and the defendant, it is usually expressed by saying that they are not in privity of contract.'" Carlino v. Borusiewicz, No. 15-CV-0372, 2016 WL 613828, at *4 (M.D. Pa. Feb. 16, 2016)(quoting Zeno v. Ford Motor Co., Inc., 480 F. Supp. 2d 825, 841-42 (W.D. Pa. 2007)). "'Privity of contract exists when there is a connection or relationship which exists between two or more contracting parties.'" Id. (quoting Zeno, supra, at 841-42); see also Deynzer v. Columbia Gas of Pennsylvania, Inc., 875 A.2d 298, 301 (Pa. Super. Ct. 2005) ("[P]rivity of contract is personal privity, and is confined to the persons of the contracting parties.").

Consistent with these principles, Pennsylvania courts have recognized that a lack of contractual privity generally bars an insured from attempting to recover insurance benefits

---

[8] An exception to this general rule exists where the person lacking privity can assert rights as a third-party beneficiary of the contract. A third-party beneficiary is "one who, although not a party to the contract, and hence, not in privity with the promisor...is permitted to enforce the contract between the promisor and the promisee for its (the third-party beneficiary's) benefit." Visor Builders, Inc. v. Devon E. Tranter, Inc., 470 F. Supp. 911, 923 (M.D. Pa. 1978). Under Pennsylvania law,

> a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Ario v. Reliance Ins. Co., 981 A.2d 950, 959 (Pa. Commw. Ct. 2009) (quoting Scarpitti v. Weborg, 609 A.2d 147, 150 (Pa. 1992)) (emphasis added). See also Guy v. Liederbach, 459 A.2d 744, 751 (Pa. 1983) (adopting Restatement (Second) of Contracts, §302(1)).

In this case, HSB has not alleged that it had enforceable rights under the Policy under a third-party beneficiary theory. Even if it had, HSB has not proffered evidence demonstrating that Hartford and IGP mutually intended that IGP assume contractual duties for the benefit of HSB under the Policy.

directly from a re-insurance company. In <u>Reid v. Ruffin</u>, 469 A.2d 1030 (Pa. 1983), the

Pennsylvania Supreme Court explained that

> [t]he reason for the rule is inherent in the nature of the reinsurance contract. Reinsurance is
>
>> the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the *liability of the reinsurer is solely to the reinsured*, which is the ceding company, and in which contract the *ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss....*
>>
>> The reinsurance situation arises ... [when] the ceding company finds that it has more risks than it cares to keep in its own portfolio.... The original insured is not notified of the reinsurance, has no contact with the reinsuring company, and is generally not a party to the contract and has no legal interest therein.

<u>Reid</u>, 469 A.2d at 1033) (emphasis in the original) (quoting 13A Appleman, Insurance Law and

Practice § 7681 (1976)).

Here, there is no dispute that the subject Policy was issued to IGP by Hartford. Although

HSB was a party to a separate Reinsurance Treaty with Hartford, it was not a party to the

underlying Policy. Thus, HSB was never in contractual privity with IGP. It is nevertheless clear

that Count I of the TAC is premised on contractual rights inherent in the Policy, since plaintiffs

seek to void the Policy and recover payments pursuant to one of its provisions – namely,

Common Policy Condition (C). Because HSB was never a party to the Policy, it did not have

rights thereunder and IGP owed it no contractual duty. Consequently HSB is not entitled, in its

capacity as Hartford's reinsurer, to a judicial declaration that the Policy is void as against IGP,

nor is it entitled to recover payments under the Policy. <u>See Dunkin' Donuts Franchised

Restaurants, LLC v. Claudia I, LLC</u>, Civil Action No. 12-2010, 2013 WL 3716525, at *3 (E.D.

Pa. July 15, 2013) ("In general, a person must be in privity of contract to sue for damages for

breach of such contract.").

Despite this, HSB argues that it has standing to assert the breach of contract claim in TAC Count I because, in essence, it is simply challenging IGP's coverage under the Policy. Citing North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194 (3d Cir. 1995), HSB insist that, "as a reinsurer, HSB retains the right to question whether coverage under an insurance policy exists, and, therefore, retains the right to challenge coverage under IGP's insurance policy, and its corresponding liability, in light of IGP's fraud." (Pls.' Br. Opp. to Def. IGP's Mot. Summ. J. at 8, ECF No. 223 (citing North River Ins. Co., 52 F.3d at 1199, 1204-07, 1211).)

In North River, the Third Circuit Court of Appeals explained that "[t]he reinsurance relationship depends on the reinsurer and the reinsured observing high levels of good faith." 52 F.3d at 1199 (citation omitted). In particular, "[t]he reinsured must keep its interests aligned with those of the reinsurer, ... and the reinsurer must 'follow the fortunes' of the reinsured..." Id. (internal and end citations omitted). Despite this, the court recognized that a reinsurer "retains the right to question whether the reinsured's liability stems from an unreinsured loss." Id. at 1199-1200. "A loss would be unreinsured if it was not contemplated by the original insurance policy or if it was expressly excluded by terms of the certificate of reinsurance." Id. at 1200. Thus, the court recognized in North River that a reinsurer can decline to make payments under the reinsurance policy if the loss at issue is not within the scope of coverage contemplated by the reinsurer. A reinsurer can similarly refuse to make payments where its reinsured entered into a collusive settlement with the original insured party. See 52 F.3d at 1207 (recognizing that the "follow the fortunes" doctrine does not require a court to find reinsurance coverage where the liability to the insured was the result of fraud and collusion). In those circumstances, the reinsurer would be justified in refusing to make indemnification payments to its reinsured. Here, however, HSB is not challenging the right of its reinsured to obtain indemnification under the

25

Reinsurance Treaty; rather, HSB is essentially seeking to enforce a provision in the underlying Policy between the reinsured and its policyholder. Nothing in <u>North River</u> suggests that HSB can acquire rights in a contract to which it was not a party.

HSB also argues that an exception to the general rule of privity should be recognized in this case based on the unique factual circumstances at issue. HSB contends that this is not the typical case in which the insured deals solely with its own direct insurer and the direct insurer is the sole entity making coverage decisions. Rather, HSB believes that a "fact-specific exception" to the general privity rule should apply here because HSB was actively involved in the adjustment of IGP's claim and IGP perpetrated the alleged fraud directly upon HSB as well as upon Hartford.

Generally, "the burden is on one who claims under a contract to show that he has a cognizable interest therein." <u>Rottmund</u>, 761 F. Supp. at 1208 (citing <u>Fourtees Co. v. Sterling Equipment Corp.</u>, 363 A.2d 1229, 1232 (Pa. Super. Ct. 1976)). Here, HSB has articulated no basis for establishing an exception in this case that would warrant recognizing a contractual right of action against IGP under the terms of the Policy. Because HSB was never a party to the Policy or in privity with one of the contracting parties, it did not have rights under the Policy vis-a-vis IGP. Consequently, IGP is entitled to judgment as a matter of law relative to HSB's claim against it in Count I of the TAC.

### 2. IGP's Alleged Violation of the Insurance Fraud Statute (TAC Count III)

In Count III of the TAC, plaintiffs assert a claim against IGP for alleged violation of Pennsylvania's Insurance Fraud Statute, 18 Pa. C.S.A. §§ 4117 <u>et seq</u>. Here again, IGP argues that HSB lacks standing to assert any claim under this law.

In relevant part, the Insurance Fraud Statute makes it unlawful for any person to:

26

(2) Knowingly and with the intent to defraud any insurer or self-insured, present[ ] or cause[ ] to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim[;]

(3) Knowingly and with the intent to defraud any insurer or self-insured, assist[ ], abet[ ], solicit[ ] or conspire[ ] with another to prepare or make any statement that is intended to be presented to any insurer or self-insured in connection with, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim, including information which documents or supports an amount claimed in excess of the actual loss sustained by the claimant[;] [or]

(5) Knowingly benefit[ ], directly or indirectly, from the proceeds derived from a violation of this section due to the assistance, conspiracy or urging of any person.

18 Pa. Cons. Stat. Ann. § 4117(a)(2)(3), and (5) (West). An insurer that is damaged as a result of a statutory violation can sue to recover compensatory damages, "which may include reasonable investigation expenses, costs of suit and attorney fees." Id. at § 4117(g). Further, "[a]n insurer may recover treble damages if the court determines that the defendant has engaged in a pattern of violating this section." Id. Plaintiffs allege that IGP violated the aforementioned provisions, thereby entitling plaintiffs to recover their compensatory damages, reasonable investigation expenses, costs of suit, attorney's fees, and treble damages. (TAC ¶¶107-08.)

IGP argues that it is entitled to summary judgment on HSB's claim because HSB was not an "insurer" to IGP or a party to the Policy. The Statute defines the term "insurer" to mean:

[a] company, association or exchange defined by section 101 of the act of May 17, 1921 (P.L. 682, No. 284), known as The Insurance Company Law of 1921;[ ] an unincorporated association of underwriting members; a hospital plan corporation; a professional health services plan corporation; a health maintenance organization; a fraternal benefit society; and a self-insured health care entity under the act of October 15, 1975 (P.L. 390, No. 111), known as the Health Care Services Malpractice Act.

18 Pa. Stat. and Cons. Stat. Ann. § 4117(l) (West) (footnote omitted).[9]  IGP claims that the definition of "insurer" does not encompass a reinsurer.

In support of its position, IGP notes the Pennsylvania Legislature's awareness of the distinction between insurers and reinsurers, as evidenced by certain statutory regulations that are applicable to insurers, but not reinsurers.  See, e.g., 40 Pa. Stat. §46(a) (requiring foreign "insurance compan[ies], association[s] [and] exchange[s]" to acquire a certificate of authority to do business within the Commonwealth); cf. 40 Pa. Stat. §46(e) (3)(certificate of authority not applicable to contracts of reinsurance); see also 40 Pa. Stat. §1222  (Casualty and Surety Rate Regulatory Act applies to "all classes and kinds of insurance which may be written by stock or mutual fire, marine or fire and marine insurance companies, associations or exchanges..."); cf. id. at §1222(a) (stating that the Casualty and Surety Rate Regulatory Act is inapplicable to reinsurance); see also 40 Pa. Stat. §991.1802 (defining "insurer" or "member insurer," for purposes of the Pennsylvania Property and Casualty Insurance Guaranty Association Act, to mean "[a]ny insurance company, association or exchange which is licensed to write and is

_____

[9] The Insurance Company Law of 1921, in turn, defines these terms as follows:

> The word "company," as used in this act, shall be construed to include incorporated insurance companies only, and title insurance companies, whether incorporated under the laws of this Commonwealth, or any other state, territory, or district, or under the laws of any foreign country.

> Except where otherwise indicated, the word "association," as used in this act, shall be construed to include only individuals, partnerships or associations of individuals, authorized to engage in the business of insurance in the Commonwealth as insurers on the Lloyds plan.

> The word "exchange," as used in this act, shall be construed to include only individuals, partnerships and corporations, authorized by the laws of the Commonwealth to exchange with each other inter-insurance or reciprocal insurance contracts.

40 Pa. Stat. Ann. § 361 (West).

engaged in writing within this Commonwealth, *on a direct basis*, property and casualty insurance policies")(emphasis supplied); see also 40 Pa. Stat.§321.1 (separate definitions provided for "insurer[s]" and "reinsurer" in laws pertaining to reinsurance intermediaries).

More compelling than this, IGP argues, is the use of the term "insurer" in the Insurance Fraud Prevention Act ("IFPA"), 40 Pa. Stat. §§325.3 et seq., which was enacted, in part, to "establish, coordinate and fund activities... to improve and support insurance fraud prosecution." Id. at §325.2. To that end, the IFPA establishes an Insurance Fraud Prevention Authority and a trust fund, which is administered by the state treasurer with the advice of the Authority, for the purposes of effectuating the IFPA. 40 Pa. Stat. §§ 325.21, 325.23(a). The IFPA expressly defines the term "insurance fraud" with reference to the Insurance Fraud Statute. See id. at §325.3 (defining "Insurance fraud" to mean "[a]ny activity defined as an offense under 18 Pa.C.S. § 4117..."). Notably, the IFPA provides that the trust fund shall be funded by an assessment on "each insurer" engaged in writing "[t]he following coverages: ... all fire and casualty *direct business* written and accident and health and credit accident and health written under life/annuity/accident and health *direct business* written." Id. at §325.23(c)(1) and (2) (emphasis supplied). According to IGP, this statutory reference to "direct business" makes clear that the Legislature is knowingly using the term "insurer" in the IFPA to exclude reinsurers.

HSB counters that it is an incorporated insurance company within the meaning of the Insurance Company Law of 1921 and, as such, it qualifies as an "insurer" within the meaning of 18 Pa. C.S.A. §4117(l). Since "insurers" who are damaged by fraud can sue under the insurance fraud statute, HSB insists that the plain language of the statute provides it a cause of action. HSB insists that construing the statute otherwise deprives it of recourse against IGP, despite the fact that it (HSB) is the party most directly injured by IGP's alleged fraud. HSB points out that,

by operation of its treaty with Hartford, it reimbursed Hartford for all amounts paid on the claims and also assumed the costs of investigating, adjusting, and settling IGP's claims and the alleged related fraud. HSB posits that, if it is deprived of a statutory remedy, IGP may be able to evade liability altogether on the theory that Hartford did not sustain "damages" as a result of the alleged fraud and therefore, Hartford – like HSB – cannot sue under the Insurance Fraud Statute.

Although HSB acknowledges the various statutory provisions that distinguish between contracts of direct insurance and contracts of reinsurance, HSB insists that these distinctions are created based upon the type of policy issued and not the entity issuing the policy; in other words, HSB argues, these provisions were intended to regulate insurance companies based upon the types of policies issued. HSB contrasts these provisions with the insurance fraud statute which, it says, "plainly refers solely to those business entities that issue insurance policies without reference to the types of policies the entities issue." (HSB Br. Opp. Mot. Summ. J. at 14, ECF No. 223.) The fact that a company issues policies of reinsurance makes the company no less an insurance company, according to HSB.

The parties' competing interpretations of §4117 warrant this court's resort to well established canons of statutory construction. Under Pennsylvania's Statutory Construction Act of 1972, "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. Cons.Stat. Ann. § 1921(a). To that end, "[e]very statute shall be construed, if possible, to give effect to all its provisions," and a court "should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." Id.; O'Rourke v. Commonwealth, 566 Pa. 161, 778 A.2d 1194, 1283 (2014). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. Cons.Stat. Ann. § 1921(b).

On the other hand, when a provision is susceptible of differing interpretations, a court must apply other canons of construction and look beyond the statute's text to glean the legislature's intent. Pa. Fin. Responsibility Assigned Claims Plan v. English, 664 A.2d 84, 87 (Pa. 1995).

Here, the term "insurer" arguably is an ambiguous term as it relates to the distinction between direct insurers and reinsurers, so the court may look elsewhere to ascertain legislative intent. IGP urges the court to construe Section 4117(b)(2) as in *pari materia* with the provisions of the Insurance Fraud Prevention Act. "Statutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things." 1 Pa. Cons.Stat. Ann. § 1932. "Laws in pari materia shall be construed together, if possible, as one law." Whiteman v. Degnan Chevrolet, Inc., 272 A.2d 244, 247 (Pa. Super. Ct. 1970) (citation omitted).

IGP's argument on this point is fairly persuasive. As noted, the IFPA creates a trust fund designed to support prosecution of insurance fraud, among other things. The IFPA cross-references §4117, which makes insurance fraud part of the crimes code and also provides a private right of action for "insurers" who are damaged by insurance fraud. The IFPA's trust fund is funded by an assessment only on policies of direct insurance, suggesting that reinsurers – who do not pay the assessment -- are not the intended beneficiaries of the trust. The insurance fraud statute and the IFPA are in pari materia, and the court will therefore construe them together. Doing so supports IGP's argument that HSB did not act as an "insurer" to IGP within the meaning of 4117, and it is therefore precluded from asserting a claim of statutory insurance fraud.

This interpretation is further buttressed by the General Assembly's admonishment, in accordance with the rule of lenity, that penal provisions be strictly construed. 1 Pa. Cons.Stat.

Ann. § 1928.  As a penal provision that also provides a civil cause of action, Section 4117 is subject to this rule; consequently, any ambiguities in the statute should be interpreted strictly and consistently in both the criminal and the civil context. See Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies."); Brown v. Bureau of Prof'l & Occupational Affairs, 18 A.3d 1256, 1259 (Pa. Commw. Ct. 2011) ("Consistent with the rule of lenity ... 1 Pa.C.S. § 1928 requires that every penal provision, whether in a civil or criminal statute, be construed strictly.").  See also Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr., 129 F. Supp. 3d 160, 170 (E.D. Pa. 2015) (applying the rule of lenity to conclude that defendants, who were not licensed to provide health care in Pennsylvania, were not "health care providers" under the terms of the insurance fraud statute), reconsideration denied, motion to certify appeal granted sub nom. Aetna Life Ins. Co. v. Found. Surgery Affiliates, LLC, No. CV 13-3101, 2016 WL 354881 (E.D. Pa. Jan. 28, 2016).

HSB argues that, if it is excluded from asserting a claim for statutory insurance fraud, it will be without a remedy despite being the party most harmed by IGP's allegedly fraudulent conduct.  As IGP points out, though, HSB was not precluded from asserting a claim against IGP for common law fraud. For whatever reason, it did not do so.  The court is not at liberty to supply an avenue for redress beyond the scope of what the Pennsylvania Legislature has provided. Because HSB was not an "insurer" to IGP within the meaning of §4117,[10] it lacks standing to

---

[10] The court notes parenthetically that HSB has denied its status as an "insurer" to IGP for purposes of IGP's statutory and common law "bad faith" claims, as set forth in Counterclaims 4 and 5, discussed infra.  HSB's self-serving denial of "insurer" status for purposes of Counterclaims 4 and 5, although not dispositive of TAC Count III, is nevertheless consistent with this court's conclusion that HSB also cannot be considered IGP's "insurer" for purposes of HSB's claim for damages under the insurance fraud statute.

pursue a statutory claim of insurance fraud. Accordingly, IGP's motion for summary judgment against HSB will be granted with respect to TAC Count III.

### 3. IGP's Alleged Bad Faith (TAC Count IV)

Plaintiffs' final cause of action asserts a claim against IGP for "reverse bad faith." Their theory is that IGP had a duty of good faith and fair dealing under its insurance policy, which IGP breached by "intentionally concealing material information, intentionally making false representations of material facts, and [ ] submitting false, forged and fraudulent documents to HSB and [ ] Hartford in its attempt to maximize its insurance recovery and extend the time during which it could receive business interruption payments as long as possible." (TAC ¶¶ 110-111.)

IGP argues that HSB's claim fails for two reasons. First, it insists that Pennsylvania has not recognized a cause of action for "reverse bad faith" in the context of insurance coverage. Second, assuming Pennsylvania did recognize such a theory, the only source for such a doctrine would be a common law duty of good faith arising from a contractual relationship between IGP and HSB, which does not exist here.

HSB argues that federal courts in Pennsylvania have predicted that the Supreme Court of Pennsylvania would conclude that the duty of good faith is a reciprocal duty that runs both from the insurer to the insured and from the insured to the insurer. (HSB Br. Opp. Mot. Summ. Judg. at 17 (citing authority), ECF No. 223.) HSB further reasons that, because it has a cause of action against IGP for breach of the Policy based on IGP's alleged fraud, it would be "incongruous" to deny HSB an otherwise viable cause of action against IGP for "reverse bad faith" based on the same Policy. (Id. at 19.)

HSB's position lacks merit. As both parties acknowledge, any duty of good faith on the part of IGP would necessarily arise, if at all, from the common law duty of good faith and fair dealing that is inherent in its policy with Hartford. See generally Birth Ctr. v. St. Paul. Cos., Inc., 787 A.2d 376, 385 (Pa. 2001); Dercoli v. Pa. Nat'l. Mut. Ins. Co., 554 A.2d 906, 906-09 (Pa. 1989); Gray v. Nationwide Mut. Ins. Co., 223 A.2d 8, 11-12 (Pa. 1966). As was previously discussed in connection with TAC Count I, HSB was not in privity with IGP relative to the underlying Policy and possesses no rights under the Policy. Because there is no contract between HSB and IGP, HSB cannot maintain a claim against IGP for reverse bad faith, even if such a claim would be recognized in Pennsylvania. Accordingly, IGP's motion for summary judgment against HSB will be granted as it relates to TAC Count IV.

B. IGP's Motion for Partial Summary Judgment Against Hartford [ECF No. 213]

IGP also moves for partial summary judgment as it relates to IGP's first counterclaim ("Counterclaim 1") against Hartford for alleged breach of contract.[11] (See Counterclaim Count I, ECF No. 158.) IGP asserts that Pennsylvania law affords it "two fundamental rights" as a party to a property insurance policy: (1) the privilege of choosing the identity of the other party to the

---

[11] Because IGP has the burden of proving Counterclaim 1 at trial, it is subject to a more "stringent" standard of review at the summary judgment stage. See National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir.1992) ("Where the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent."). The Third Circuit has explained that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." Id. (citing Resolution Trust Corp. v. Gill, 960 F.2d 336, 340 (3d Cir.1992)). In other words, in order to be entitled to summary judgment a plaintiff must "produce enough evidence to justify a directed verdict in its favor in order to meet its initial burden." Id. at 1582 n. 2 (quoting with approval Celotex, 477 U.S. at 331 (Brennan, J., dissenting) and citing with approval William W. Schwarzer et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477 (1991)). See also Sallie v. Lynk, No. 2:10CV456, 2012 WL 995245, at *13 (W.D. Pa. Mar. 23, 2012).

contract, and (2) the right to deal exclusively with that party in negotiating a settlement of the claim without interference from third parties. (Def.'s Br. Supp. Mot. Summ. Judg. at 3, ECF No. 214 (citing Spires v. Hanover Fire Ins. Co., 70 A.2d 828 (Pa. 1950)).) According to IGP, Hartford's conduct in delegating the claims adjustment process to HSB completely frustrated these "fundamental" contract rights.

In essence, IGP's complaint is that HSB handled the claims adjustment process in lieu of Hartford and made many of the "judgment calls" that are inherent to that process. IGP posits that "[b]y their very nature, the answer to many of these questions affecting the amount to be paid to the insured lack precise answers or come down to matters of opinion, which means that claims such as IGP's are often resolved through a 'give and take' process between the insurer and the insured..." (Br. Supp. Mot. Summ. Judg. at 2, ECF No. 214.) IGP objects to the fact that, pursuant to the Reinsurance Treaty, HSB took over the claims adjustment process and, along the way, made numerous discretionary decisions, such as which experts would be retained to assist with the loss, whether certain damaged parts should be replaced or repaired, the expected time frame for any necessary repairs and for business restoration, how delays attributable to third party suppliers would be handled, and the like. IGP insists that its claim would have been handled much differently, and more favorably, if Hartford, rather than HSB, had adjusted the loss.

Hartford maintains that IGP's motion sets forth a "revisionist history" of the claims adjustment process which seeks to shift blame onto Hartford when, in fact, IGP's principals failed in their duty to cooperate during the claim process in good faith by making misrepresentations and submitting fraudulent documents to support its claim. Hartford argues that "[i]t is common practice for insurance companies to retain independent adjusters to

35

investigate and adjust their claims," and, "[i]n this particular claim, rather than retaining an independent adjuster, Hartford had the reinsurer, HSB, perform adjustment and investigation services pursuant to a reinsurance treaty between the two companies." (Pl. Hartford's Br. Opp. to Def. IGP's Mot. Partial Summ. J. at 3, ECF No. 225.)  According to Hartford, nothing in the Policy barred Hartford from permitting HSB to "take the lead" in investigating and adjusting the claim.  While HSB did so, Hartford insists that it remained involved throughout the claims adjustment process by monitoring communications, keeping up to date on the investigations and claim adjustment events, and maintaining regular communications with representatives of the Gleason Group and with IGP's president, Joe Nocito.

Under Pennsylvania law, a plaintiff asserting a breach of contract claim must demonstrate:  (1) there was a contract; (2) the defendant breached the contract; and (3) the plaintiff suffered damages as a result of the breach.  McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010).  Both IGP and Hartford agree that the first element is satisfied here, since the Policy constituted an enforceable contractual agreement between Hartford and IGP.  They dispute whether the remaining two elements can be demonstrated, however.

In insurance contract disputes, the proper focus is the reasonable expectations of the insured policyholder, and, in most cases, "the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations."  Duda v. Standard Ins. Co., No. 15-2302, 2016 WL 2731669, at *7 (3d Cir. May 10, 2016).  Here, the Policy clearly identified Hartford as IGP's "insurer," and IGP had a reasonable expectation that Hartford would act as such.  Hartford makes much of the fact that the Policy did not preclude it from obtaining reinsurance; indeed, the Policy contemplates that Hartford's loss of reinsurance may constitute grounds for cancellation of the Policy.  However, it is also true that, in the traditional reinsurance

36

relationship, it is the reinsured party, rather than the reinsurer, that maintains contact with the original insured and handles adjustment of the insured's claim; the reinsurer often has no contact at all with the original insured. See Reid v. Ruffin, 469 A.2d 1030, 1033 (Pa. 1983) ("Reinsurance is the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss.") (quoting 13A Appleman, Insurance Law and Practice §7681 (1976)). While the Reinsurance Treaty contemplated that HSB would have more active involvement in the adjustment of losses like IGP's, the terms of the Treaty were apparently not disclosed to IGP at the time it contracted with Hartford. Therefore, based on the language of the Policy, IGP could reasonably expect that Hartford, as its "insurer," would be meaningfully involved in, and accountable for, the investigation and settlement of its claim.

Here, the record shows that Hartford underwrote and sold the Policy in question and, at all times, remained contractually bound to render payments thereunder. Although HSB fully indemnified Hartford for payments that were made under the Policy, Hartford was the entity that directly paid IGP. Under the terms of the Reinsurance Treaty, Hartford retained its right to participate in claims adjustment and settlement proceedings, at its own expense, and did so. Indeed, the record is replete with documentation evidencing Hartford's regular contact with representatives of IGP, HSB and its own insurance broker, the Gleason Agency. Its representatives were regularly copied and included in the ongoing communications between and among the parties. At times, Hartford representatives Chris Correll and Alan Mycek acted as intermediaries when disputes about coverage arose. Although IGP has produced evidence

37

demonstrating Hartford's deference to HSB in the claims adjustment process, the court finds that there is a genuinely disputed issue of fact on this record as to whether Hartford abandoned its role as insurer and thereby materially breached the terms of the Policy. See Creghan v. Procura Mgmt., Inc., 91 F. Supp. 3d 631, 645 (E.D. Pa. 2015) (recognizing that the question of whether there has been a material breach of a contract is ordinarily for a jury) (citing Cameron v. Berger, 7 A.2d 293, 296 (Pa. 1938)).

Moreover, to the extent a material breach on the part of Hartford can be established, there are issues of fact as to when the breach occurred. The evidence which IGP has compiled in order to demonstrate Hartford's abandonment of IGP involved a number of incidents during the claims adjustment process wherein key discretionary decisions were made by HSB agents rather than by Hartford. For example, IGP objects to the fact that HSB:

- decided to treat the two accidents as one loss incident subject to one set of policy limits rather than two separate loss incidents (see Def.'s Br. Supp. Mot. Summ. J. at 39, ECF No. 214);

- selected the insurer's expert (id. at 40-42);

- withheld the advice from its professional engineers that the services of a process control vendor be utilized (id. at 43-45);

- selected the loss payment option and specifically declined to conduct its own repairs of the damaged property (id. at 45-46);

- controlled the scope and timing of the necessary repairs (id. at 46-47);

- calculated IGP's business interruption losses and, in doing so, allegedly placed an artificially low value on those losses without the benefit of an informed analysis (id. at 47-50); and

- decided to suspend IGP business income loss payments when IGP relocated its business (id. at 50-51).

Most fundamentally, IGP objects to HSB's decision to declare the Policy null and void in its July 21, 2008 cancellation letter. (Id. at 35-38.)

38

Because these events unfolded over the course of many months, the court cannot determine, as a matter of law, when the alleged "breach," if any, occurred.[12] The timing of the alleged breach is significant, however, because plaintiffs contend that IGP itself materially breached the terms of Common Policy Condition (C), thereby creating a contractual basis for voiding the Policy.[13]

Under Pennsylvania law, if a party to a contract commits a material breach, the non-breaching party has two mutually exclusive options: it can either rescind the contract and seek restitution or it can continue performance under the contract and seek damages. See McCausland v. Wagner, 78 A.3d 1093, 1102 (Pa. Super. Ct. 2013) ("In a breach of contract suit, the plaintiff **either** may rescind the contract and seek restitution or enforce the contract and recover damages based on expectation. In such a case, the inconsistent nature of those actions is obvious—one cannot attempt to terminate his contractual obligations and, at the same time, seek to enforce the contract and enjoy its full benefits in an action for breach.") (quoting Smith v. Brink, 561 A.2d 1253, 1255 (Pa. Super. Ct. 1989) (emphasis in original); see also Umbelina v. Adams, 34 A.3d 151 (Pa. Super. Ct.2011) (explaining that a party cannot maintain at one time claims for rescission and restitution on one hand and damages for breach of contract on the same contract, as these remedies are essentially inconsistent); Pappan Enters., Inc. v. Hardee's Food Sys., Inc. 143 F.3d 800, 806 (3d Cir. 1988) ("Under basic contract principles, when one party to

---

[12] Elsewhere in its brief, IGP maintains that Hartford's "real material breach" occurred when it relegated control over IGP's covered loss directly to HSB in late September or early October 2007, and IGP is therefore "not limited to those specific incidents where IGP will be able to prove that Hartford would have adjusted IGP's claim differently." (Def.'s Br. Supp. Mot. Summ. Judg. at 7, ECF No. 236.) However, the record in this case gives rise to competing inferences concerning whether, and when, a material breach of the Policy may have occurred.

[13] As is discussed in more detail below, the record here gives rise to numerous disputed issues of material fact bearing on whether IGP engaged in fraudulent conduct. For present purposes, however, the court finds that the evidence could reasonably support a finding of fraud.

a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages."). "The election of whether to continue the contract and sue for breach or terminate the contract must be made promptly." Weichert Co. of Pa., Inc. v. Long & Foster Real Estate, Inc., No. 03-00849, 2005 WL 6195331 at ¶236 (C.C.P. Mont. Cty. Mar. 30, 2005) (citing Williston on Contracts §39.31 (2000)). If the non-breaching party elects to continue the contract, it will not be relieved of its obligations thereunder. See Pappan Enters., 143 F.3d at 806 ("Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits."); Weichert Co., 2005 WL 6195331 at ¶ 237 (former managers of plaintiff were not excused from honoring the restrictive covenants contained in their employment agreements, even assuming that employer materially breached those agreements by withholding certain payments, where managers continued with their employment for several years following the purported breach).

In this case, IGP did not seek termination of the Policy based on Hartford's alleged breach; rather, it continued the contract and now seeks damages as a means to obtain the benefit of its contractual bargain. See Birth Ctr. v. St. Paul Companies, Inc., 787 A.2d 376, 385 (Pa. 2001) ("The purpose of damages in contract actions is to return the parties to the position they would have been in but for the breach.") (citation omitted). IGP cannot sue to recover benefits under the Policy and, at the same time, avoid the operation of Common Policy Conditions II(C). Thus, even if IGP can prove a material breach on the part of Hartford, IGP's obligations under the "Concealment, Misrepresentation, or Fraud" provision were not discharged by virtue of Hartford's alleged breach. Stated differently, IGP cannot obtain the benefits of the Policy if IGP itself materially breached Common Policy Condition (C).

Accordingly, at trial, the factfinder will have to determine whether each party to the Policy materially breached the terms of their contract. These contested factual issues make summary judgment inappropriate. Accordingly, IGP's motion for partial summary judgment on Counterclaim 1 will be denied.

C. Plaintiffs' Motion for Summary Judgment Against IGP [ECF No. 207]

We next consider plaintiffs' cross-motion for summary judgment, which is being asserted as to every claim and counterclaim raised in this litigation. For the reasons previously discussed, the court has already determined that IGP is entitled to summary judgment on all claims asserted against it by HSB. Accordingly, plaintiffs' motion for summary judgment is denied insofar as it relates to HSB's claims in Counts I, III, and IV of the TAC. As to those particular claims, the court will consider only whether Hartford has established grounds for an award of summary judgment.[14]

1. *Hartford's Claims for Alleged Breach of Common Policy Condition (C) Relating to "Concealment, Misrepresentation or Fraud" (TAC Count I ), Statutory Insurance Fraud (TAC Count III), and Reverse Bad Faith (TAC Count IV)*

Counts I, III and IV of the TAC respectively assert claims against IGP for breach of Common Policy Condition (C) relating to "Concealment, Misrepresentation and Fraud," statutory insurance fraud, and "reverse" bad faith. Each of these claims is premised on the general theory that IGP, through its employees, agents, and apparent agents, made fraudulent misrepresentations and/or engaged in fraudulent conduct in connection with its insurance claim.

---

[14] With regard to Counts I, III, and IV of the TAC, Hartford, as plaintiff, bears the burden of proof at trial, and the more "stringent" standard of review applies. See n. 11, supra.

As previously noted, the alleged fraud relates to various statements and/or conduct bearing on: (i) the alleged need for, origin of, and shipping of replacement rollers for IGP's damaged furnace; and (ii) the employment status of Paul Ciarrochi, Jr.

### a) TAC Count I: Breach of the Common Policy Condition (C)

In Count I of the TAC, Hartford argues that IGP's violation of Common Policy Condition (C) constitutes grounds for voiding the Policy, bars IGP's attempts to recover any damages thereunder, and permits Hartford to recover insurance payments that were made to IGP. IGP initially argues that, as a matter of law, Hartford has no right to require adherence to the terms of the Policy because it materially breached the Policy when it abandoned its role as IGP's "insurer." By virtue of this "material breach," IGP claims, it was relieved of any duty to perform under the Policy.

This argument is basically a rehash of IGP's argument in support of its own summary judgment motion relative to Counterclaim 1. As noted, Hartford's alleged "material breach" of the Policy – assuming such is proven -- gave IGP the option to terminate the contract and seek a rescission or continue with the contract and seek damages for Hartford's alleged non-performance. IGP has pursued the latter option and cannot now argue that its own obligations under the Policy were excused by Hartford's alleged breach.

IGP also contends, however, that Hartford cannot satisfy the substantive elements of its fraud claims. In order to void an insurance policy under Pennsylvania law, the insurer must prove that: (1) the insured made a false representation; (2) the insured knew the representation

was false when it was made, or the insured made the misrepresentation in bad faith; and (3) the representation was material to the risk being insured.  See Millard v. Shelby Cas. Ins. Co., No. 3:CV-02-1902, 2005 WL 2035860, at *4 (M.D. Pa. Aug. 24, 2005); Saracco v. Vigilant Ins. Co., No. Civ. A. 99-3502, 2000 WL 202274, at *2 (E.D. Pa. Feb. 22, 2000), aff'd, 250 F.3d 736 (3d Cir. 2001) (Table).  Here, IGP maintains that Hartford cannot demonstrate that it knowingly made false statements relative to either Mr. Ciarrochi or the ceramic rollers.

(i)  Apparent Authority

Hartford's fraud claim relative to the rollers centers largely on the "Roller Timeline" that was generated by Fernandez and the documentation in support of that timeline, which Fernandez forwarded to Wolfe on April 22, 2008, while copying Nocito on the same email.  (See Pl.s' Ex. 28, ECF No. 210-18; Pl.s' Ex. 34, ECF No. 210-19.)   Wolfe then forwarded this documentation on to HSB.  (Pl.s' Ex. 30, 210-19.)  Because Hartford's fraud claims are based largely on Fernandez's representations and conduct – particularly as it relates to the issue of the rollers, the court must initially consider the extent to which Fernandez's actions are attributable to IGP.  Not surprisingly, the parties disagree on this point.  Hartford claims that, at all relevant times, Fernandez was acting at least as the apparent agent of IGP, while IGP argues that Fernandez was acting in his own interests in his capacity as a third-party consultant to IGP.

Under Pennsylvania law, "[a]pparent authority is power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted." Revere Press, Inc. v. Blumberg, 246 A.2d 407, 410 (Pa. 1968). Apparent authority thus flows from acts of the principal, but is viewed from the lens of what the other party should reasonably know.  See Hartley v. United Mine Workers of Am., Robena Local Union No. 6321, 113 A.2d 239, 247 (Pa. 1955); Restatement (Second) of Agency § 49 (1958).

43

"The authority of an agent of a corporation may be presumed from his position and the nature of the act." Rednor & Kline, Inc. v. Dep't of Highways, 196 A.2d 355, 358 (Pa. 1964); Passarelli v. Shields, 156 A.2d 343 (Pa. Super. Ct. 1959). Moreover, a principal "is not relieved from liability by the fact that the apparent agent acts entirely for his own purposes, unless the other has notice of this." Restatement (Second) of Agency §262; see also Rednor & Kline, 196 A.2d at 358 ("If the principal puts one into, or knowingly permits him to occupy, a position in which, according to the ordinary experience and habits of mankind, it is usual for the occupant to have authority of a particular kind, anyone having occasion to deal with one in that position is justified in inferring that the person in question possesses such authority, unless the contrary is then made known.") (footnote omitted).

The question of apparent authority generally is an issue of fact for the jury. Eaglebank v. BR Prof'l Sports Grp., Inc., No. 15-2880, 2016 WL 2946166, at *3 (3d Cir. May 20, 2016); see also Loyle v. Hertz Corp., 940 A.2d 401, 408 (Pa. Super. Ct. 2007) (finding that the question of apparent authority creates a genuine issue of material fact for a jury's determination); Gizzi v. Texaco, Inc., 437 F.2d 308, 310 (3d Cir. 1971)("Questions of apparent authority are questions of fact and are therefore for the jury to determine.")(citing authority). Like other factual issues, the court may decide that a party is clothed with apparent authority as a matter of law when the evidence is so one-sided as to preclude a reasonable jury from deciding otherwise. See Eaglebank, 2016 WL 2946166, at *3 (affirming summary judgment for plaintiff in a suit to recover assets on a secured loan agreement where no reasonable jury could find that the individual who had signed the loan agreement on behalf of the borrower had acted without apparent authority).

Here, the evidence concerning Fernandez's authority to act as an agent of IGP is mixed. There is no dispute that Fernandez interacted with the insurance carriers on occasion in regards to IGP's claim, sometimes at Nocito's express invitation. (Pl.s' Ex. 5, Nocito Dep. at 84:5-25, Dec. 17, 2010, ECF No. 210-6; Pl.s' Ex. 9, ECF No. 210-12.) It is also undisputed that Fernandez occupied an office with a desktop computer at IGP's facility during the time period in question. (DCMF ¶¶16-17.) In addition, Hartford has proffered evidence that Fernandez gave Ron Chauffe, HSB's "engineering consultant," an IGP business card which identified Fernandez as IGP's "Senior VP, Operations and Sales." (Pl.s' Ex. 39, Chauffe Dep. at 13:14-14:9, ECF No. 210-22; Pl.s' Ex. 6, ECF No. 210-8.) The business card, which is part of the evidentiary record, is designed in the same format as other IGP employees and bears Fernandez' name, along with the email address "fferndandez@intglass.com." (Pl.s' Ex. 5, Nocito Dep. at 85:10-19, Dec. 17, 2010, ECF No. 210-6; Pl.s' Ex. 6, ECF No. 210-8.) Hartford also points to certain third-party documents in which Fernandez was identified as IGP's "Senior Vice President of Operations and Sales," namely: (1) a letter from IGP addressed to another business entity known as Bruce Plastics and (2) a verified "Application for Assistance" that IGP submitted to the Pennsylvania Industrial Development Authority. (Pl.s' Ex. 13 and 14, ECF No. 210-15.) Finally, a document produced in discovery from IGP's business files, entitled "Prime Organizational Chart," depicts Nocito at the top of the corporate structure with Fernandez immediately below Nocito. (Pls.' Ex. 4, ECF No. 210-5.)

Notwithstanding this, IGP strongly denies that Fernandez was an officer or agent of the company, or that he was held out as such to the plaintiffs. The record is somewhat muddled on this point, but it suggests plaintiffs' awareness that Fernandez wore different hats and was employed by numerous business entities in varying capacities during the time frame relevant to

IGP's claim adjustment. Fernandez and Nocito testified that Fernandez served as an independent consultant to IGP in 2007 while also performing work for a number of different businesses, including Global Networking and Gemtron, a competitor company. (Def.'s Ex. 8, Fernandez Dep. at 206:22-207:27, 358:14-15, 360:2, February 10, 2014, ECF No. 229-8; Def.'s Ex. 15, Nocito Dep. at 103:22-104:4, Dec. 17, 2010, ECF No. 229-15; Def.'s Ex. 6, Nocito Dep. at 101:1-4, June 11, 2009, ECF No. 229-6.) According to IGP, Fernandez' role as a consultant ended in or around December 2007. (Def.'s Ex. 6, Nocito Dep. at 101:1-8, June 11, 2009, EFC No. 229-6; Fernandez Dep. at 359:25-360:8.) Beginning in February 2008, Fernandez served as a furnace repair contractor to IGP through an entity known as FERPASO; he also served as a vendor to IGP in his capacity as a representative of Global Networking during the time period in question. (Def.'s Ex. 6, Nocito Dep. at 101:1-4, June 11, 2009, ECF No. 229-6; Def.'s Ex. 21, Alvaro Fernandez Dep. at 9:21-10:7, Sept. 30, 2010, ECF No. 229-21; Def.'s Ex. 22, ECF No. 229-22.) According to Fernandez, he was never asked by IGP to fulfill any particular role vis-a-vis the insurance carriers but, as the individual who was the most knowledgeable about the furnace, he occasionally talked to the carrier's representatives about the equipment and any necessary parts. (Fernandez Dep. at 211:5-212:5, ECF No. 229-8.)

Nocito and Fernandez both testified that, in conjunction with a planned expansion of the business and its relocation to the Robinson Township facility, IGP planned to bring Fernandez into the business as a part owner with the formal title "Vice President of Sales and Operations"; however, this expansion never occurred due to events following the loss incidents. (Pl.'s Ex. 5, Nocito Dep. at 87:2-88:12, ECF No. 210-6; Def.'s Ex. 8, Fernandez Dep. at 137:15-138:13, ECF No. 229-8.) IGP contends that the business card and third-party documents which designate Fernandez as an officer of IGP were prepared in anticipation of IGP's future business expansion

and did not reflect Fernandez' actual status vis-a-vis IGP during the claim adjustment period. (Nocito Dep. at 87:20-88:12, 91:23-97:22, ECF No. 210-6; Def.'s Ex. 8, Fernandez Dep. at 137:16-138:15, ECF No. 229-8; see also DCMF ¶¶ 20-22.)  IGP further contends that the insurance carriers could not have been misled by the "Prime Organizational Chart," or IGP's letters to Bruce Plastics or the Pennsylvania Industrial Development Authority, because the Chart did not exist in 2007 and because there is no evidence to suggest that the carriers ever possessed or relied on these documents.  (See DCMF ¶10, 20-22.)  With regard to the business cards bearing Fernandez' name and job title, Fernandez testified that the cards were produced in connection with IGP's planned expansion and his expectation of being brought into the business as a part owner, but he denies that he used the cards or ever gave one to Chauffe.  (Def.'s Ex. 8, Ferndandez Dep. at 137:16-138:25, ECF No. 229-8.)  Nocito testified that he was not even aware that the business cards existed, as Fernandez was never authorized to hold himself out as an officer of IGP.  (Pl.s' Ex. 5, Nocito Dep. 85:8-9, 86:2-4, ECF No. 210-6.).

Significantly, IGP has adduced evidence indicating that plaintiffs were made aware of Fernandez' independent status vis-a-vis IGP.  They point to the fact that plaintiffs had access to IGP's payroll records, which reflected the fact that Fernandez was not an IGP employee. (See DCMF ¶10.)  They note Fernandez' testimony that he informed HSB's representatives soon after the loss that he was a consultant and did not "answer to" Nocito.  (Def.'s Ex. 8, Fernandez Dep. at 212:20-213:22, ECF No. 229-8; Def.'s Ex. 18, Hart Dep. at 169:10-170:9, 173:14:24, ECF No. 229-18; Def.'s Ex. 19, ECF No. 229-19.)   IGP also points to evidence indicating that, at different times during the claims adjustment period, the insurance carriers' representatives were made aware of the fact that Fernandez was acting in his own interests as an agent of Global Networking or as an independent contractor operating under the business name "FERPASO."

47

(See generally DCMF ¶¶ 13-19, ECF No. 227.)  For example, Fernandez and Nocito both testified that Fernandez disclosed his agency relationship with Global Networking in connection with his acquisition of the rollers.  (See DCMF at ¶14.)  In addition, various documents in the record – to which the carriers were privy – reflect Fernandez' status as an independent contractor operating under the business name "FERPASO."  (See id. at ¶¶ 13-14.)  In fact, the contract between IGP and FERPASO, which plaintiffs were asked to review and pre-approve, expressly disclaimed Fernandez' status as an agent of IGP and expressly indicated his status as an independent contractor.  (DCMF at ¶18; Def.'s Ex. 41, ECF No. 229-41; Def.'s Ex. 42, ECF No. 229-42.)  Moreover, Chauffe testified that, during a January 17, 2008 meeting, Fernandez expressly advised those in attendance that he was not working with IGP and was acting to protect his own interests.  (DCMF at ¶15.)

If credited by a jury, IGP's evidence could support a reasonable inference of plaintiffs' awareness that Fernandez was acting in his own interests and not as an actual or apparent agent of IGP at the time he made misrepresentations and/or engaged in allegedly fraudulent conduct concerning the rollers.  Thus, there are genuinely disputed issues of fact on this record concerning Fernandez' alleged status as an actual or apparent agent of IGP.  Because Fernandez's conduct relative to the claims adjustment process forms a substantial part of the factual underpinning for Hartford's claims in TAC Counts I, III and IV, the factual disputes concerning Fernandez' status vis-a-vis IGP are material to a resolution of Hartford's claims.

(ii) Representations Concerning the Ceramic Rollers

Material issues of fact also exist relative to Hartford's theory that IGP never ordered ceramic rollers from Global Networking and that it simply sent the damaged rollers from its own furnace to Vesuvius for refurbishing.  In short, IGP has presented testimony and evidence

48

sufficient to support its claim that: (i) the damaged rollers were not reasonably capable of refurbishment and were ultimately discarded; (ii) Fernandez did, in fact, order new rollers from Global Networking, but Global had difficulty producing rollers that were suitable for IGP's equipment; (iii) unbeknownst to Nocito, Fernandez had approximately 178 pre-existing rollers refurbished by Vesuvius after Global was unable to fulfill IGP's order in a timely fashion; (iv) some of these rollers came from IGP's inventory, but the bulk of the refurbished rollers were owned by Fernandez personally and not by IGP;[15] (v) Fernandez undertook these measures in order to mitigate IGP's lost revenues while Global continued to work on the new rollers and because he wanted to fulfill Global Networking contractual promise to produce rollers for IGP; and (vi) Fernandez did not tell Nocito about the refurbished rollers because he wanted to avoid the embarrassment of Nocito learning that Global Network had failed to fulfill IGP's order in a timely fashion.  (See generally DCMF ¶¶ 10, 13, 25, 28-29, 36-38, 40, 43-48, 52-53, 56-57, 94, 203-208, ECF No. 227.)

Hartford's fraud claim is based largely on evidence that a materially inaccurate "roller timeline" and phony bills of lading and shipping documents were produced by Fernandez to buttress the false narrative that new rollers had been shipped, on a delayed basis, from Global to IGP.  The record reveals that the underlying shipping documents were prepared by Lindsay Sopher Senft, a former purchasing agent for IGP, from blank forms obtained off the internet.  (Pl.s' Ex. 12, Senft Dep. at 18:7-19, 83:13-87:18, ECF No. 210-14.)  Senft testified that she obtained and completed these forms at the request of Fernandez, with information provided by him.  (Id.)  There is no evidence to establish that Nocito was personally aware of Senft's actions in this regard, much less that he authorized them, and Fernandez maintains that he kept the

---

[15] Fernandez testified that he acquired these rollers years earlier when a company known as AccuGlass had originally purchased the furnace.  (DCMF ¶57, ECF No.227.)

documents and information from Nocito. (See DCMF ¶48.) Senft acknowledged that she questioned the propriety of Fernandez' request, but she did what he asked and did not inquire further into the circumstances. (Senft. Dep. at 83:13-20, 84:25-85:10.) Viewing the evidence in the light most favorable to IGP, a jury could conclude that the misrepresentations presented in the roller timeline and supporting documentation were attributable solely to Fernandez acting in his capacity as a third-party vendor, as opposed to evidencing a fraudulent intent on the part of IGP.

Hartford also theorizes that IGP personnel altered a document received from Vesuvius in order to cast the false impression that lead times on new rollers would take up to eight months, when, in fact, the lead time was only fourteen (14) to eighteen (18) weeks. Vesuvius employee Doug Brown testified that he spoke to an IGP employee named "Jessica" and advised her of the correct lead time, then followed up with a letter confirming this information. (Pl.s' Ex. 35, Brown Dep. at 8:7-10:10, ECF No. 210-20.) According to Brown, the version of his letter that was supplied to the insurance carriers was changed to reflect a longer, inaccurate lead time for the new rollers. (Id. at 10:2-10, 12:5-9.)

IGP flatly denies that there was any alteration of Brown's letter. To that end, IGP notes that Jessica Emark, the only "Jessica" employed at IGP, has denied ever speaking with Doug Brown or receiving the letter that he sent. (See Pl.s' Ex. 61, Emark Dep. at 126:16-135:3, ECF No. 210-26.) She further denied having any knowledge about a possible alteration to the letter. (Id. at 135:6-137:17.) IGP also notes that Vesuvius has not been able to produce a copy of the alleged "correct, original" version of the letter that was supposedly altered. (See Brown Dep. at 14:19-15:2.) In addition, IGP has produced evidence establishing that Vesuvius was indeed experiencing significant lag times as reported by some of its agents. (See DCMF ¶¶ 49-50.)

50

This conflict in the evidence gives rise to a genuinely disputed issue as to whether Brown's letter was altered and, if so, whether the conduct can be imputed to IGP as evidence of a fraudulent intent.

Hartford also points to the testimony of Ciarrochi as proof that IGP intentionally manipulated the contents of the crate in which the replacement rollers were delivered so as to cast the false appearance that the Vesuvius-refurbished rollers had originated from Global. Ciarocchi testified that the damaged rollers from IGP's furnace were packed and shipped to Vesuvius for refurbishing at the direction of Fernandez. (Pl.s' Ex. E, Ciarrochi Dep. at 50:4-51:1, ECF No. 210-11.) Ciarrochi further claims that, when the refurbished rollers arrived back at IGP's new facility, an employee by the name of "Steve" was directed to repack the crate so that the Vesuvius-refurbished rollers were concealed by a top layer of new replacement rollers. (Ciarrochi Dep. at 70:23-71:22.) Chauffe then photographed the contents of the crate and observed the "Vesuvius" label on some of the rollers. (Pl.s' Ex. 39, Chauffe Dep. at 62:18-65:17, ECF No. 210-22; Pl.s' Ex. 69, ECF No. 210-34; Pl.s' Ex. 70, ECF No. 210-35.)

As compelling as Ciarrochi's testimony may prove to be, it is not uncontested. IGP has presented testimony that the refurbished rollers came not from IGP's damaged furnace but from Fernandez' own personal stock. (Fernandez Dep. at 170:17-171:20, 299:19-23.) IGP has also produced evidence suggesting that it purchased a smaller quantity of new rollers from Vesuvius and that this fact was known to HSB from the beginning. (See DCMF ¶¶ 26, 55.) As for the alleged attempt to manipulate the appearance of the crate's contents, IGP denies this accusation and points to Fernandez' testimony that the refurbished rollers were inspected upon receipt and then placed back into the same "Vesuvius"-labelled crates in which they had been delivered. (Fernandez Dep. at 284:7-285:18.)

If the evidence of record is viewed in the light most favorable to IGP, it is sufficient to support an inference that IGP acted only on the basis of information provided by third parties and did not itself knowingly make false representations to the insurance carriers concerning the need for new rollers, the source of those rollers, or the time frame in which they were made available to IGP. To be sure, the parties' differing accounts about the rollers are largely in direct conflict with one another and plaintiffs strongly dispute IGP's version of the events. Ultimately, however, resolution of these competing accounts will turn on credibility issues and competing inferences that cannot be definitively resolved at the summary judgment stage. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict"). Accordingly, genuinely disputed issues of material fact preclude this court from entering summary judgment on Hartford's claim of fraud as it relates to IGP's acquisition of the replacement rollers.

### (iii) Representations Relating to Paul Ciarrochi, Jr.

Hartford also contends that IGP made fraudulent representations concerning the employment status and salary of Ciarrochi. In particular, Hartford claims that Nocito and Wolfe falsely stated in various emails that Ciarrochi had left IGP's employment and that, in order to complete repairs to its furnace and production line, IGP would have to pay Ciarrochi $19,000 per month for a period of three months.

The record reflects that, in emails dated January 25 and 29, 2008, Nocito represented to plaintiffs that Ciarrochi had opportunities to work for "the competition." (See Pl.s' Ex. 42 and 43, ECF No. 210-23.) In a subsequent email dated March 5, 2008, Nocito wrote:

...I have hired Paul back to work for IGP. As everyone is well aware, he is an extremely valuable asset to IGP. He has requested that I pay him both W2 & 1099 based on advice from his accountants. It actually works to IGP's advantage paying the majority of his pay as 1099. If this presents a problem please let me know immediately. I hope HSB is as happy as I am that Paul has left the competition and decided to come back full-time to IGP. His departure would have been a tremendous loss to IGP and the repair process ...

(Pl.s' Ex. 45, ECF No. 210-23.) Nocito further stated in his email that he was attaching "payroll registers for the past two pay periods." (Id.) The record that Nocito attached reflected a salary payment of $2,500.00 and a 1099 payment of $9,500.00 to Ciarrochi for the period covering February 17, 2008 to March 1, 2008. (Id.)

Hartford contends that the representations in Nocito's emails and payroll attachment were fraudulent. To support this claim, they rely on the testimony of Ciarrochi, who denies that he was contacted by an IGP competitor, denies that he ever left IGP's employment, denies discussing or receiving payment from IGP on a 1099 basis, and denies earning more than $4,000 per month salary while at IGP. (See generally Pl.s' Ex. 8, Ciarrochi Dep. at 112:4-6, 117:9-125:8, April 28, 2009, ECF No. 210-11.) Ciarrochi further testified that:

At the time Ron Chauffe had offered to fix the plant and move it and get everything back and running for, I don't know, a million dollars or someting like that. But what they told me was that ...I was going to be working for Frank and we would pose as a company that was going to rebuild and move the plant because I guess that's a quote that Frank gave them for what we were going to do, a lot lower than Chauffe's.

(Ciarrochi Dep. at 118:21-119:5.) When asked about Nocito's representations to the insurance carriers concerning his "status changing and that type tying, the 1099 stuff," Ciarrochi acknowledged "they did tell me that that's what they were going to tell the insurance company." (Id. at 119:19-120:2.)

Here again, Ciarrochi's testimony, though potentially damaging to IGP, is not uncontradicted. Nocito testified that both Fernandez and Ciarrochi had told him in late 2007 or

early 2008 that Ciarrochi had an opportunity to work for a competitor. (Def.'s Ex. 6, Nocito Dep. 102:1-6, 102:19-103:19, June 11, 2009, ECF No. 229-6.) According to Nocito, he advised Ciarrochi that, if his new employment opportunity did not fully occupy his time, Ciarrochi was welcome to work at IGP on the side, and IGP would continue to pay him. (Nocito Dep. at 102:19-104:3, ECF No. 229-6.) Nocito maintains that he learned from his human resources manager that Ciarrochi had, in fact, resigned from IGP and, at some later point in 2008, Ciarrochi was hired back. (Id. at 104:19-22; Nocito Dep. at 133:6-14, December 17, 2010, ECF No. 229-15.) In support of this testimony, IGP has produced payroll records that ostensibly document a severance payment to Ciarrochi in January 2008. (Def.'s Ex. 80, ECF No. 229-80.)

With regard to the allegedly fraudulent payroll record showing the 1099 payment, Nocito testified that this record was merely reflective of IGP's desire and request of HSB for permission to pay Ciarrochi at a monthly rate of $19,000, for a limited three-month period, for services that would be rendered by Ciarrochi in connection with repairs to the damaged furnace. (See generally Nocito Dep. at 135:7-139:9, ECF No. 229-15; see also DCMF ¶¶ 70, 72, 75-76.) According to Nocito, the $19,000 monthly rate was consistent with a pay rate that Chauffe himself had previously quoted when attempting to recruit Ciarrochi and Fernandez to work for ElectriMech, a company that was also bidding on repairs to IGP's furnace. (Nocito Dep. at 138:16-19, ECF No. 229-15; see also Nocito Dep. at 208:8-22, ECF No. 229-6; Def.'s Ex. 83, ECF No. 229-83, DCMF ¶¶ 72, 75-76.) Nocito testified that, while IGP issued a check payable to Ciarrochi in the amount of $9500 as reflected on the payroll record, the payment was understood to be contingent at all times upon approval by HSB. (Nocito Dep. at 138:21-24, ECF No. 229-15.) Because the payment was never approved by HSB, the check was never given to Ciarrochi; rather, it was voided, and Ciarrochi never officially became a 1099 employee. (Id. at

54

136:20-138:8, 139:5-9.)  Nocito maintains that this "whole situation" was made clear to HSB's accountants at the time.  (Id. at 139:5-9; see generally DCMF ¶¶ 70, 72.)  Insofar as Nocito's testimony is at odds with the testimony of Ciarrochi, IGP points to Ciarrochi's admissions that he was under the influence of many pain killers in 2007, is "not very good with dates or times," and was on prescription anti-depressants at the time of his deposition.  (Ciarrochi Dep. at 13:16-21, 141:3-19, ECF No. 229-7.)

Construing the evidence of record in the light most favorable to IGP, the court finds that there are genuinely disputed issues of fact as to whether IGP knowingly made false representations to the insurance carriers concerning Ciarrochi's employment status and salary and whether any such misrepresentations in this regard were material to the adjustment of IGP's insurance claim.  To the extent Nocito's testimony can be characterized as vague, self-serving or contradicted by other evidence in the record, these are matters to be explored through cross-examination at trial.  It is up to a factfinder, at trial, to determine what weight, if any, should be given to Nocito's testimony; this court may not make that determination at summary judgment.

Hartford's fraud claim also rests, in part, on statements that Wolfe made in a March 25, 2008 email to Mycek. In that email, Wolfe discussed several aspects of HSB's handling of IGP's claim, including HSB's concerns over IGP's ordering of certain heating elements and related parts for its damaged furnace. With regard to the latter issue, Wolfe wrote the following:

> It was noted at the 10-30-07 on site meeting that rollers and elements were needed for furnace number 2.  Mr. Nocito needed to order the elements but did not have either Frank or Paul on staff at the time to arrange the order for the correct elements.  He hired Paul back for the one job and Paul determined which elements should be ordered by specification ...

(Pl.s' Ex. 46, ECF no. 210-23.)  In the same email, Wolfe stated the following concerning Ciarrochi's salary:

Paul [Ciarrochi] works for International Glass not FERPASO. He is now making more than $19K a month from his original salary with International Glass. It was discussed that the competition was willing to pay more for Paul's salary. Paul also was approached by Ron Chauffe of ElectriMech to work as part of his contractor team in bring [sic] back the furnace to pre-loss. Ron had suggested paying Paul $150.00 an hour. This interference with a prior employee of International Glass has created a financial difficulty. There were suggestions made that Paul go back to work as a subcontractor for FERPASO. However in the meantime this expense is difficult. International Glass asked if Paul's salary can be paid by HSB. Again we mentioned that this is probably only a 3 month period. Either way we would like a definitive answer ...

(Id.)

To the extent that Hartford's fraud claim is premised upon representations made by Wolfe, the court finds that, here again, material issues of fact preclude an award of summary judgment. Among other things, there are issues of fact concerning Wolfe's status as an actual or apparent agent of IGP, the falsity of her statements, and her state of mind as it bears on the truth or falsity of her various representations. Accordingly, the evidence adduced by plaintiffs does not warrant an award of summary judgment relative to TAC Count I.

b) TAC Count III: Statutory Insurance Fraud

In Count II of the TAC, Hartford asserts a claim for statutory insurance fraud pursuant to 18 Pa. C.S.A. §4117. As discussed previously, the statute makes it unlawful for a person to "*knowingly and with the intent to defraud* any insurer... present[ ] or cause[ ] to be presented to any insurer...any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim." Id. at §4117(a)(2) (emphasis added). The Act further makes it unlawful for a person, "knowingly and with the intent to defraud," to assist, abet, solicit or conspire with another in such conduct. Id. at §4117(a)(3).

The parties argue at length about whether the Pennsylvania insurance fraud statute incorporates detrimental reliance as a necessary element of the offense. For present purposes, however, the court need not resolve this dispute. As the prosecuting party, Hartford must establish, as a matter of law, that each of the elements of its claim are satisfied. Hartford has not done so because, as discussed, there are genuine issues of fact on this record as to whether or not IGP knowingly, and with intent to defraud, presented false or misleading information to the carriers in connection with its insurance claim. See State Farm Mut. Auto Ins. Co. v. Lincow, 715 F. Supp. 2d 617, 632 (E.D. Pa. 2010) (noting that the statute makes it unlawful for a person to (1) knowingly (2) present any false, incomplete, or misleading information (3) concerning any fact or thing material to a claim; (4) to an insurer)(citing 18 Pa. C.S.A. §4117(a)(2)), aff'd 444 F. App'x 617 (3d Cir. 2011). Accordingly, Hartford's motion for summary judgment will be denied with respect to TAC Count III.[16]

### 2. *Breach of Contract (Counterclaims 1 and 2 – v. Hartford only)*

The court will next consider plaintiffs' motion for summary judgment as it relates to IGP's various counterclaims. IGP's first two counterclaims involve breach of contract theories asserted against Hartford only. In Counterclaim 1, IGP alleges that Hartford breached the terms of the Policy by essentially abandoning its insured and delegating all discretionary decision-making to HSB. In Counterclaim 2, IGP alleges that Hartford breached the terms of the Policy

---

[16] Count IV of the TAC asserts a claim for "reverse bad faith" on the part of IGP. This claim, like Counts I and III, is premised on the allegation that IGP intentionally concealed material information, intentionally made false representations of material fact, and submitted false, forged, and fraudulent documents to the plaintiffs in an attempt to maximize its insurance recovery and extend the time during which it could receive business interruption payments. (See ECF No. 142.) Although plaintiffs seek summary judgment on all claims involved in the case, including (presumably) TAC Count IV, they do not specifically address this claim in their supporting brief. In any event, however, summary judgment is inappropriate as to TAC Count IV, given the existing material issues of fact that the court has identified herein.

through the "improper performance" of its contractual duties by its agent, HSB. This alleged improper performance includes, among other things, the decision to adjust IGP's claim as a single loss incident rather than as two separate loss incidents, the undervaluation of IGP's business interruption losses, and the carriers' failure to pay for glass that was needed to test the post-repair functionality of the damaged furnace.

Hartford contends that IGP's breach of contract claims fail because the Policy itself was rendered void by virtue of IGP's fraudulent conduct. Thus, Hartford's defense to Counterclaims 1 and 2 is essentially the same theory of fraudulent misrepresentations that underlie its own claims in Counts I, II, and IV of the TAC.

For the reasons discussed herein, plaintiffs' fraudulent misrepresentation theory raises numerous disputed issues of material fact which cannot be resolved by this court at the summary judgment stage. Accordingly, Hartford's motion for summary judgment cannot be granted on that basis.

Alternatively, Hartford seeks summary judgment relative to IGP's estoppel theory as set forth in the body of Counterclaim 2. (See Countercl. 2, ¶¶ 93-100, ECF No. 158.) Paragraphs 93 to 100 of Counterclaim 2 allude to communications between the parties' respective counsel which occurred on July 22, 2008. These communications confirmed that, notwithstanding HSB's July 21, 2008 letter purporting to void the Policy, the carriers still sought to go forward with a previously-scheduled inspection of IGP's plant on July 23, 2008 pursuant to the Policy's "Property Loss Condition[ ] 3(f) and (i)."[17] (See id. at ¶¶ 91-95.) IGP avers in Counterclaim 2

---

[17] This provision stated as follows:

    **3.      Duties in the Event of Loss or Damage**

that "HSB and The Hartford ratified, reinstated, and reaffirmed the validity of the Policy by demanding and exercising the Insurer's rights under the Policy with full knowledge of the circumstances alleged in the letter of July 21, 2008." (Id. at ¶ 97.)

Hartford moves for summary judgment on this particular aspect of Counterclaim 2 on the basis that the argument was previously rejected at the Rule 12(c) stage (see ECF No. 61), and that ruling now constitutes the "law of the case." IGP disputes that the court's Rule 12(c) ruling, rendered in November of 2009, is controlling at the summary judgment stage.

The "law of the case" doctrine holds that, "'once an issue has been decided, parties may not relitigate that issue in the same case.'" Hazen v. Modern Food Servs., Inc., 113 F. App'x 442, 444 (3d Cir. 2004) (quoting Ogbudimkpa v. Ashcroft, 342 F.3d 207 n. 7 (3d Cir.2003)). In Hazen, the Third Circuit Court of Appeals ruled that the district court was not precluded from granting summary judgment in favor of an employer/defendant in a Title VII action based on the plaintiff's failure to establish a *prima facie* case of retaliation, notwithstanding the fact that the district court had previously denied the employer's motion for judgment on the pleadings and determined that the plaintiffs' pleading, on its face, stated a viable cause of action. 113 F. App'x at 444. The court explained that:

> [t]he defendants' motion for judgment on the pleadings and their motion for summary judgment obviously raised very different issues and required distinct

---

You must see that the following are done in the event of loss of or damage to Covered Property: ...

f. Permit us to inspect the property and records proving the loss or damage. Also permit us to take samples of damaged property for inspection, testing and analysis. ...

i. Cooperate with us in the investigation or settlement of the claim.

inquiries. In deciding the motion for judgment on the pleadings, the district court determines from the pleadings "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir.1997). However, when deciding a motion for summary judgment, the district court reviews all discovery and determines whether a genuine issue of material fact exists. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir.2000). The standard used to decide these two very different motions is obviously not the same. In deciding a motion to dismiss on the pleadings, the court presumes that the plaintiff will be able to prove the allegations set forth in the pleadings, and then determines if those allegations establish a cause of action. Summary judgment involves no such presumption.

Id.

IGP argues that the "law of the case" is similarly inapplicable here, because both the relevant standard of review and the party bearing the burden of proof are different at this stage of the proceedings. Whereas IGP bore the burden of proving its Rule 12(c) motion, Hartford is now the movant and bears the burden of proving its entitlement to summary judgment. Of course, for purposes of Rule 56, IGP must receive the benefit of every legitimate inference that arises from the facts, which must also be viewed in its favor.

In the ordinary, run-of-the-mill situation, IGP's position might well have merit. Here, however, the court's Rule 12(c) ruling went beyond a mere denial of IGP's motion. In the course of opining on IGP's waiver theory, the court specifically found that "only one reasonable conclusion [could] be drawn" from the record – namely, that "plaintiffs did not waive the right to seek relief for breach of contract by inspecting the property IGP claimed had been repaired; nor did they reaffirm or commit to administer the policy in a manner that would permit coverage of a fraudulent claim." (Mem. Order of 11/23/09 at 5, ECF No. 61.) Even though the court was compelled to view the record in the light most favorable to plaintiffs, it noted there was "*no course of conduct that is sufficient* to support a finding of a waiver of plaintiffs' rights to claim relief based on a breach of contract, let alone a reaffirmation of an insurance contract to be

performed pursuant to the commission of [alleged] insurance fraud." (<u>Id</u>. at 4 (emphasis added).)

The court drew this conclusion because:

> the evident purpose of the inspection was to determine whether and how the production line had been repaired. The inspection was undertaken to assure proper administration of IGP's claims for coverage and that a full understanding of the circumstances was gained in conjunction therewith. Such an undertaking had the potential to benefit IGP in its ability to maintain all or partial coverage of the claim and to comply with plaintiffs' statutory and regulatory obligations. Acting in such a manner cannot be understood as a clear, unequivocal and decisive act undertaken with the purpose of surrendering the right to deny coverage and void the policy based on insurance fraud. Consequently, plaintiffs did not waive any rights they possessed under the policy prior to the inspection.

(Id. at 4.)

In essence, the court ruled, as a matter of law, that IGP could not demonstrate waiver of the alleged breach or reaffirmation of the Policy based on the conduct alleged in Counterclaim 2. And, although summary judgment rulings are typically rendered on a more developed factual record, there is no indication here that the evidentiary record at this stage of the proceedings materially alters the relevant facts. Accordingly, because the court previously determined, as a matter of law, that waiver and/or reaffirmation could not be established based on the conduct alleged at Paragraphs 93 through 103 of Counterclaim 2, and because no additional evidence has been advanced in support of that theory, Hartford is entitled to summary judgment relative to this aspect of IGP's breach of contract claim.

3.  *Statutory and Common Law Bad Faith (Counterclaims 4 and 5 – v. Hartford)*

Counterclaims 4 and 5 asserts claims for statutory and common law bad faith against Hartford.[18] IGP bases these claims both on "what Hartford itself did or did not do" and "what

---

[18] Although IGP's Answer and Counterclaims originally asserted claims against HSB as well as Hartford, IGP's brief in opposition to summary judgment discusses the bad faith claims only

Hartford allowed HSB to do." (Def.'s Br. Opp. Mot. Summ. J. at 55 of 80, ECF No. 226.) More specifically, IGP maintains that Hartford acted in bad faith by turning the investigation and adjustment of IGP's loss over to HSB under circumstances wherein HSB had the final say on important discretionary decisions yet regarded itself as having no duty of good faith vis-a-vis IGP and (unbeknownst to IGP) also had a financial incentive to minimize payments made under the Policy. IGP maintains that Hartford is liable for HSB's actions relative to its adjustment of IGP's claim which, according to IGP, involved HSB placing its own financial interest over those of Hartford's insured.

Hartford insists that there can be no bad faith on its part as a matter of law because it paid over $2.4 million dollars toward IGP's claim, it undertook reasonable investigatory steps regarding the claim, and it ultimately had reasonable grounds to deny the claim and void the Policy on the basis of fraud. Alternatively, Hartford argues that the complained-of conduct amounts to, at most, negligence.

Under Pennsylvania common law, "an insurer may be held liable 'if the insurer's handling of the claim ... was done in such a manner as to evidence bad faith on the part of the insurer *in the discharge of its contractual duty.*" Reid v. Ruffin, 469 A.2d 1030, 1033-34 (Pa. 1983) (quoting Cowden v. Aetna Cas. & Surety Co., 134 A.2d 223, 227 (Pa. 1957) (emphasis in the original)). Pennsylvania's bad faith statute, 42 Pa.C.S.A. §8371, further provides that,

> [i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> > (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

---

insofar as they relate to Hartford. Accordingly, IGP appears to have abandoned its bad faith claims against HSB, and the court will not discuss them further.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa. Stat. and Cons. Stat. Ann. § 8371 (West).

While § 8371 does not define the term "bad faith," Pennsylvania courts have defined this concept in terms of "'the duty of good faith and fair dealing in the parties' contract and the manner in which an insurer discharged... its obligation to pay [for] a loss in the first party claim context.'" Berg v. Nationwide Mut. Ins. Co., Inc., 44 A.3d 1164, 1175-76 (Pa. Super. Ct. 2012) (quoting Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 199 (Pa. 2007) (ellipsis in the original). Generally, "[a] valid cause of action for bad faith requires 'clear and convincing evidence...that the insurer: (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim.'" Treadways LLC v. Travelers Indem. Co., 467 F. App'x 143, 146-47 (3d Cir. 2012) (quoting J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004)). The "clear and convincing" standard requires evidence that is "'so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" Id. (quoting Pilosi, 393 F.3d at 367).

While typically defined in terms of an insurer's failure to cover an insured's loss, "[b]ad faith encompasses a wide variety of objectionable conduct." Brown v. Progressive Ins. Co., 860 A.2d 493, 500 (Pa. Super. Ct. 2004). See also Treadways LLC, 467 F. App'x at 147 ("Though ... bad faith may be found in circumstances other than an insured's refusal to pay, '[a] reasonable basis is all that is required to defeat a claim of bad faith.'") (quoting Pilosi, 393 F.3d at 367); Myerski v. First Acceptance Ins. Co., Inc., No. 3:16-CV-488, 2016 WL 3227266, at *6 (M.D. Pa. June 13, 2016) ("Bad faith is not restricted to an insurer's denial of benefits and includes a

wide variety of objectionable conduct including lack of good faith investigation and failure to communicate with a client."); O'Donnell ex. rel. Mitro v. Allstate Ins. Co., 734 A.2d 901, 906-08 (Pa. Super. Ct. 1999) (discussing the expanding nature of the applicability of the bad faith statute).

Here, IGP's bad faith claim rests on the premise that Hartford essentially abandoned its insured during the claims adjustment process by turning IGP's fate over to an unrelated third party that, as a practical matter, was not subject to Hartford's control, had no contractual accountability to IGP, and had a financial incentive to minimize the amount of payments that would be made to IGP under the Policy. IGP has produced evidence to support its theory that HSB was given the final say on various issues that were important, if not critical, to the adjustment of IGP's loss and the continuation of its business, including the valuation of IGP's daily revenue value (which were important for purposes of calculating its business income losses), the determination that business income payments would cease upon IGP's relocation to the new Robinson Township facility, and the ultimate decision to cancel the Policy. IGP has also produced evidence from which a factfinder could infer that HSB, in exercising its discretion, placed its own financial interests ahead of Harford's insured. HSB's direct contact with IGP and decision-making on policy coverage issues were seemingly in conflict with the "Special Handling Instructions" relative to the Reinsurance Treaty. Finally, IGP has produced evidence to suggest that Hartford disagreed with HSB's course of action in important respects, yet failed to take any corrective action for the benefit of its insured. (See generally DSMF ¶¶ 51-86, 90-94, 102, 108, 110, 148-57, 159,173-75, 176-188, 196.) As IGP's direct insurer, Hartford may be held liable to IGP for the acts committed by HSB in connection with the investigation and adjustment of its claim. See Tippett v. Ameriprise Ins. Co., Civil Action No. 14-4710, 2015 WL

1345442, at *5 (E.D. Pa. Mar. 25, 2015) ("Pennsylvania courts permit insureds to sue their insurers for the actions of their insurers' agents, including adjusters.") (citing Bruno v. Erie Ins. Co., 106 A.3d 48, 70 (Pa. 2014)); see also Zager v. Gubernick, 208 A.2d 45, 48-49 (Pa. Super. Ct. 1965) ("When an insurance company delegates the power of adjustment, an adjuster so employed has the power to make arrangements with the insured after loss, and to bind the insurer thereby.") (citation omitted). Under these circumstances, the court is of the view that the evidentiary record, when construed in favor of IGP, could support a finding of bad faith on the part of Hartford as it relates to the investigation and adjustment of IGP's loss. Accordingly, plaintiffs' motion for summary judgment will be denied relative to Counterclaims 4 and 5.

### 4. Intentional Interference with a Contract (Counterclaim 3 – v. HSB only)

Counterclaim 3 asserts a claim against HSB for intentional interference with a contractual relationship. IGP's theory is that HSB, through its actions in adjusting IGP's loss, intentionally interfered with Hartford's performance of contractual duties and obligations under the Policy.

Under Pennsylvania law, a tortious interference with contractual relations claim has four elements: (1) the existence of a contractual, or a prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. Kepner v. Kepner, No. 835 EDA 2015, 2015 WL 7283034, at *4 (Pa. Super. Ct. Nov. 18, 2015); see also Robson Forensic, Inc. v. Heiberg, No. CV 16-1703, 2016 WL 3078960, at *3 (E.D. Pa. June 1, 2016) (citing Crivelli v. Gen. Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000)).

HSB contends that there is insufficient evidence to establish the second and third elements of IGP's claim – namely, that HSB intended to harm IGP's contractual relationship with Hartford and acted without privilege or justification in doing so.  HSB argues that its involvement in investigating and adjusting IGP's claim was entirely within the confines of its obligations under the Reinsurance Treaty.  Given its contractual obligation to investigate and settle IGP's claims, HSB insists that it cannot be said to have improperly interfered with the contractual relationship between Hartford and IGP.  This court does not agree.

Ordinarily, the actions of a claims adjuster are not redressible under a theory of intentional interference with the underlying insurance agreement.  See Steven J., Inc. v. Landmark Amer. Ins. Co., Civil Action No. 1:14-CV-0474, 2014 WL 4672498, at *4, 2014 WL 4672498 (M.D. Pa. Sept. 18, 2014) (noting that "the simple act of a claims adjuster investigating and opining upon an insurance claim at the request of an insurance company, without further well-pleaded facts, does not rise to the level of tortious interference with a contract since this conduct does not entail 'purposeful action on the part of the defendant, specifically intended to harm the existing relation, [undertaken in] the absence of privilege or justification'") (quoting The York Grp., Inc. v. Yorktowne Caskets, Inc., 924 A.2d 1234, 1245 (Pa. Super. Ct. 2007), and discussing other cases with similar holdings).  The theory underlying this principle is that:

> it is the nature of an independent claims adjuster's duties to investigate and evaluate claims made under a contract between an insured and an insurance company. This task, which the adjuster is itself contractually obliged to undertake, may on occasion lead to results which the insured believes are misguided, uninformed and wrong. In such instances, the insured may pursue relief through litigation under the policy itself.

Id.  See also OneBeacon Am. Ins. Co. v. Colgate-Palmolive Co., 995 N.Y.S.2d 35, 39 (N.Y. App. 2014) ("No claim for tortious interference is stated because, in performing the complained-of acts, Resolute acted as a designated agent, and no action for tortious interference can lie

against an agent acting within the scope of its duties on behalf of the principal.") (citations omitted).

Here, however, IGP has produced evidence which, if credited, could support an inference that HSB acted outside the scope of its agency relationship by dictating the outcome of important discretionary decisions and by placing its own financial interests ahead of Hartford's fiduciary obligations in the adjustment of IGP's loss. At least to that extent, this case lies outside the general rule which precludes relief against a claims adjuster for alleged tortious interference with contractual relations. See Steven J., Inc., 2014 WL 4672498, at *4 (court noting that an adjuster's recommendation that a claim be denied, standing alone, would not constitute the tort of intentional interference with a contractual relationship "in the absence of further, significant well-pleaded facts detailing some other purposeful misconduct by the adjuster which falls outside its privileged contractual relationship with the insurance company'); Robertson Stephens, Inc. v. Chubb Corp., 473 F. Supp. 2d 265, 276 (D.R.I. 2007) (holding that insurer's claims administrator, which also served as part reinsurer of risks underwritten by insurer, was potentially liable to insured on claim of tortious interference with insurance contract, regardless of administrator's status as "agent" of insurer where claimant alleged that administrator had puts its interests as reinsurer ahead of its responsibilities as neutral claims handler, and thereby had acted outside scope of its authority as administrator).

Because genuinely disputed issues of fact exist with respect to the second and third elements of IGP's tortious interference claim, summary judgment is not appropriate. Accordingly, plaintiffs' motion will be denied as to Counterclaim 3.

*5. Fraud (Counterclaim 6 – v. Hartford and HSB)*

In Counterclaim 6, IGP asserts a claim against Hartford and HSB for fraud. This claim has two facets: (a) plaintiffs' alleged misrepresentation that Chauffe was an expert "engineering consultant" who was qualified to provide engineering advice relative to IGP's damaged property, and (b) plaintiffs' alleged concealment of the fact that a process control vendor would be needed to oversee the repair process and to properly determine what components would be needed to restore IGP's facility to its pre-loss condition.

To prove a claim of common-law fraud, the following elements must be established: (1) a representation; (2) that is material to the transaction at hand; (3) which was made falsely, and with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) proximate causation of injury. See Weissberger v. Myers, 90 A.3d 730, 735 (Pa. Super. Ct. 2014). The evidence of fraud must be "clear and convincing," meaning that the fact-finder can come to a clear conviction, without hesitation, as to the truth of the precise fact in issue. Id.

Plaintiffs contend that IGP cannot demonstrate any evidence of false and material misrepresentations that were made with intent to mislead it, and upon which IGP justifiably relied. Alternatively, plaintiffs argue that IGP's fraud claim is barred by the gist-of-the-action doctrine.

After careful review of the record, the court agrees that summary judgment is appropriate on the basis of plaintiffs' first argument. As it relates to Chauffe, IGP's claim is deficient because the record, even when construed favorably to IGP, fails to contain sufficient evidence to support a finding, by "clear and convincing evidence," that plaintiffs made materially false representations about Chauffe's professional qualifications or that they did so with an intent to mislead IGP and induce IGP's reliance thereon. As it relates to the need for a process control

vendor, IGP's claim is deficient because there is no evidence in the record of any material misrepresentation that could support a finding of fraud. In addition, IGP has failed to identify any persuasive authority to support the proposition that HSB or Hartford had a duty to disclose this particular information in the context of this case. Because IGP has failed to adduce "clear and convincing" evidence of an actionable fraud on the part of plaintiffs, summary judgment will be entered as to Counterclaim 6.

### 6. *Negligence (Counterclaim 7 – v. Hartford and HSB)*

In Counterclaim 7, IGP asserts a claim against Hartford and HSB for alleged negligence. This claim is premised on the plaintiffs' conduct in hiring Chauffe to provide direction, consultation, and advice to IGP regarding the investigation of its loss, the repair of its damaged furnace, and the mitigation of its business interruptions, instead of utilizing a process control vendor as HSB's engineers had advised. In particular, IGP alleges that Chauffe acted negligently by, among other things, misdiagnosing the source of damage to the furnace, advising IGP not to order certain component parts for purposes of repair, and advising IGP to run the furnace on Line 1 with every other accelerator roller in place, which allegedly led to the catastrophic failure of the Line 2 furnace. IGP asserts that the Chauffe's lack of competence materially delayed and prevented IGP from resuming operations. IGP's theory implicitly assumes that plaintiffs are liable for the harm allegedly caused by Chauffe because Chauffe was an agent of HSB and HSB, in turn, acted as the agent of Hartford in investigating and adjusting IGP's loss.

Plaintiffs' only basis for seeking summary judgment relative to this claim is their argument that the negligence claim is barred by the "gist of the action" doctrine. This doctrine generally precludes a claimant from pursuing a tort action where the true gravamen -- or "gist of the action" -- is one for breach of contract. In <u>Bruno v. Erie Ins. Co</u>., 106 A.3d 48 (Pa. 2014),

the Pennsylvania Supreme Court explained that if "the facts of a particular claim establish that the duty breached is one created by the parties by the terms of the contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract," then the claim should be treated as one for breach of contract. 106 A.3d at 68. "If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." Id. Thus, "a claim sounds in negligence unless it is alleged that the party breached one of the 'specific executory promises which comprise the contract.'" New York Cent. Mut. Ins. Co. v. Edelstein, 637 F. App'x 70, 72-73 (3d Cir. 2016) (quoting Bruno, 106 A.3d at 70). Consistent with these principles, "a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract itself, since it is not founded on the breach of any of the specific executory promises which comprise the contract." Bruno, 68 A.3d at 70. "Instead, the contract is regarded merely as the vehicle or mechanism, which established the relationship between the parties, during which the tort of negligence was committed." Id. (citing cases).

In Bruno, the court applied these principles in considering whether the "gist of the action" doctrine barred the plaintiffs' negligence claim against their insurer, where the claim was premised on advice rendered by the engineer that had been retained by the insurance company's adjuster to inspect and evaluate mold that the plaintiffs had uncovered while performing home renovations. The plaintiffs argued that the engineer had negligently advised them that the mold was harmless and that they should continue their home renovations when, in fact, the mold ultimately proved to be toxic and posed serious health problems for the plaintiffs' family,

resulting in the demolition of their home. The court concluded that, under these circumstances the negligence action could proceed; it reasoned that:

> while [the insurer] had contractual obligations under its policy to investigate whether mold was present, and also to pay for all property damage caused by mold, the substance of the Brunos' allegations is not that it failed to meet these obligations; rather, it is that [the insurer], during the course of fulfilling these obligations through the actions of its agents, acted in a negligent manner by making false assurances regarding the toxicity of the mold and affirmatively recommending to the Brunos that they continue their renovation efforts, which caused them to suffer physical harm because of their reasonable reliance on those assurances. Consequently, these allegations of negligence facially concern [the insurer's] alleged breach of a general social duty, not a breach of any duty created by the insurance policy itself. The policy in this instance merely served as the vehicle which established the relationship between the Brunos and [their insurer], during the existence of which [the insurer] allegedly committed a tort.

Bruno, 106 A.3d at 71.

Here, IGP's negligence claim is grounded on Chauffe's and HSB's alleged "misfeasance in providing operational advice to IGP with respect to the 'intermittent problems' IGP was experiencing with its variable speed drive which would fail, causing the October 27 incident, and misfeasance in directing IGP to operate its equipment with only 50% of the necessary rollers," which allegedly resulted in a "wasting [of] IGP's finances" and "exhaustion" of its insurance limits. (Def.'s Br. Opp. Mot. Summ. J. at p. 71 of 80, ECF No. 226.) This claim, like the negligence claim in Bruno, concerns alleged misfeasance that was committed by the agent of Hartford's adjuster and reinsurer during the course of Hartford's performance of its obligations under the Policy. Counterclaim 7 thus involves the alleged violation of a general social duty, not a breach of any duty created by the underlying Policy. As such, it is not barred by the "gist of the action" doctrine.

Plaintiffs have asserted no other grounds for summary judgment as it relates to Counterclaim 7. As the summary judgment movants, however, plaintiffs bear the initial burden

of demonstrating the absence of a genuine issue of fact relative to IGP's negligence claim.  See

Fed. R. Civ. P. 56(a); Allen v. Susquehanna Twp. Sch. Dist., 233 F. App'x 149, 152 (3d Cir.

2007) ("'Although the initial burden is on the summary judgment movant to show the absence of

a genuine issue of material fact, the burden on the moving party may be discharged by showing

... that there is an absence of evidence to support the nonmoving party's case when the

nonmoving party bears the ultimate burden of proof.'") (quoting Singletary v. Pennsylvania

Dep't of Corrs., 266 F.3d 186, 192 n. 2 (3d Cir.2001)) (ellipsis in the original).  Because

plaintiffs' have not met their initial Rule 56 burden, their motion will be denied relative to

Counterclaim 7.

   *7.  IGP's Claim for Attorneys' Fees*

   Finally, plaintiffs have moved for summary judgment relative to IGP's claim for

attorneys' fees, as it relates to Counterclaims 1, 2, 3, 5, 6, and 7.  As plaintiffs observe,

Pennsylvania follows a well-established rule that parties to civil litigation generally bear their

own costs and attorneys' fees, unless otherwise provided by statutory authority, agreement of the

parties, or some other recognized exception.  See generally John T. ex rel Paul T. v. Delaware

Cnty. Intermediate Unit, 318 F.3d 545, 555 (3d Cir. 2003); Commonwealth Dep't of

Environmental Protection. v. Bethenergy Mines, Inc., 758 A.2d 1168, 1173 (Pa. 2000); Cher-

Rob, Inc. v. Art Monument Co., 594 A.2d 362, 363 (Pa. Super. Ct. 1991).

   Here, IGP has asserted a claim for recovery of counsel fees in each of its Counterclaims.

Plaintiffs contend that no statutory basis exists for IGP's recovery of attorneys' fees, except with

respect to Counterclaim 4, which asserts a violation of Pennsylvania's bad faith statute. Plaintiffs

further contend that there is no evidence in the record of any agreement between the parties, or

other exception, that might provide a basis for an award of attorneys' fees as they relate to

Counterclaims 1, 2, 3, 5, 6 or 7. IGP, for its part, has not responded to this aspect of plaintiffs' motion. Accordingly, plaintiffs' motion will be granted insofar as it relates to IGP's prayer for counsel fees relative to all counterclaims other than Counterclaim 4.

## IV. Conclusion

For the reasons stated above, IGP's motion for summary judgment against HSB will be granted. IGP's motion for partial summary judgment against Hartford will be denied. Plaintiffs' motion for summary judgment will be granted as it relates to: (a) Counterclaim 6, (b) IGP's theory of waiver as set forth in Paragraphs 93 through 103 of Counterclaim 2; and (c) IGP's request for attorneys' fees relative to Counterclaims 1, 2, 3, 5, 6 and 7. In all other respects, plaintiffs' motion will be denied.

An appropriate order follows.

Dated: September 29, 2016

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Richard W. DiBella, Esquire
       Paul K. Geer, Esquire
       Andrew M. Roman, Esquire
       Mark A. May, Esquire
       John Halley, Esquire
       (*Via CM/ECF Electronic Mail*)